UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                          :
SECURITIES AND EXCHANGE                                   :
COMMISSION,                                               :
                              Plaintiff,    :          13 Civ. 4645 (JPO)
                                                          :
            -v-                             :          OPINION AND ORDER
                                                          :
ONE OR MORE UNKNOWN TRADERS IN            :
THE SECURITIES OF ONYX                     :
PHARMACEUTICALS, INC.,                     :
                              Defendants.   :
                                                          :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

The Securities and Exchange Commission brought this action against unknown traders

who purchased call options for shares of Onyx Pharmaceuticals, Inc. shortly before Onyx made a

public announcement causing its shares to jump 51% in value.  The SEC alleges that these

purchases were insider trades in violation of section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5.  The Court has frozen all

assets related to the trades in question until the final disposition of this case.  Dhia Jafar and

Omar Nabulsi, who have identified themselves as two of the Defendants in this action, move to

vacate the order freezing their assets and dismiss the complaint for failure to state a claim, or, in

the alternative, to modify the order freezing their assets.  Their motion to dismiss the complaint

is granted; however, the Court will permit the SEC to file an amended complaint within thirty

days.  The freeze order is modified to apply to only $2,527,295 in the Citigroup account.

I.      **Background**

A.      **Facts**

The Court accepts the following allegations as true for purposes of this motion.  On June

13, 2013, Amgen, Inc., a biotechnology company, made an unsolicited multibillion dollar offer

to purchase Onyx.  (Compl. ¶ 15, Dkt. No. 1; Bulgozdy Decl. Ex. 1, Dkt. No. 36.)  Amgen

followed up the next day, June 14, with a written proposal to purchase all of Onyx's outstanding

shares for $120 a share.  (Compl. ¶¶ 15, 19.)  Amgen's written proposal was forwarded to

Onyx's board of directors the same day.  (*Id.* ¶ 15.)

The board met twelve days later, on Wednesday, June 26, and rejected the offer—despite

the fact that Onyx's stock was trading under $85 a share that day.  (*Id.* ¶¶ 16, 22.)  Two days

later, on Friday, June 28, Onyx informed Amgen that the board had rejected the offer.  (*Id.* ¶ 17.)

Shortly after the market closed for the week, the Financial Post, a Canadian publication, posted

an article online discussing Amgen's offer in detail.  (*Id.* ¶ 18; Bulgozdy Decl. Ex. 1.)  On

Sunday, June 30, Onyx announced Amgen's offer and announced that the board had rejected the

offer because it "undervalued Onyx and its prospects."  (Compl. ¶ 19.)  Onyx's stock jumped to

over $131 a share the next day.  (*Id.* ¶ 20.)

Beginning Wednesday, June 26—the day on which Onyx's directors voted to reject

Amgen's offer—there were three trades that the SEC characterizes as suspicious.  First, on June

26, a trader used an account with Citigroup Global Markets, Inc. to purchase 255 call options for

shares of Onyx stock.  (*Id.* ¶¶ 12, 22.)  Each option gave the trader the right to purchase 100

shares of Onyx stock for $80 or $85 a share by a date in July 2013.  (*Id.* ¶¶ 21–22.)  The

Citigroup account had not been used to purchase Onyx call options during the past year.  (*Id.*

¶ 23.)  The number of call options the trader purchased on June 26 was significantly higher than

the average number of these options that had been purchased each day of the preceding two weeks.[1]  (*Id.*)  Onyx's stock closed at just over $84 on June 26.  (*Id.* ¶ 22.)

The next day, Thursday, June 27, a trader used $151,000 from an account with Barclays Capital, Inc. to purchase 544 call options to buy Onyx stock for $85 in July 2013.  (*Id.* ¶¶ 12, 24.)  Again, the number of call options purchased with the Barclays account was significantly higher than the average number of Onyx's July $85 call options that had been purchased each day over the last two weeks.  (*Id.*)  The Barclays purchase, however, represented only about two thirds of all the July $85 options purchased that day.  (*Id.*)  In other words, approximately 300 July $85 call options were sold to at least one other account on June 27.  Onyx's stock closed at slightly over $85 a share that afternoon.  (*Id.*)

The following day, Friday, June 28, was the day Onyx told Amgen that the board had rejected Amgen's offer.  (*Id.* ¶ 17.)  That same day, a trader used the Citigroup account to purchase 50 July $90 call options and 270 July $92.50 call options for Onyx stock.  (*Id.* ¶ 25.)  The number of call options in this purchase, too, was significantly higher than the average number of July $90 and $92.50 call options that had been purchased each day since late May.[2]  (*Id.*)  After Onyx announced its rejection of Amgen's offer on Monday, July 1, Onyx's stock closed at over $131 a share.  (*Id.* ¶ 26.)  The traders who bought call options using the Citigroup

---

[1] From June 20 (the first day the July $80 call options were sold) through June 25, an average of 16 of these options were sold per day; on June 26, the Citigroup trader purchased 80 of these options.  (Compl. ¶ 23.)  From June 11 (the first day the July $85 options were sold) through June 25, an average of 6 of these options sold per day; on June 26, the Citigroup trader purchased 175 of these options.  (*Id.*)

[2] From May 23 (the first day July $90 call options were sold) through June 27, an average of 21 of these options sold per day; on June 28, the Citigroup trader purchased 50 of these options.  (Compl. ¶ 25.)  From May 22 (the first day July $92.50 call options were sold) through June 27, an average of 10 of these options sold per day; on June 28, the Citigroup trader purchased 270 of these options.  (*Id.*)

account profited over $2.2 million.  (*Id.* ¶ 27.)  The traders who bought call options using the Barclays account profited at least $2.3 million.  (*Id.*)

### B.     Procedural History

The SEC filed this action on Wednesday, July 3, 2013, claiming that the purchases using the Citigroup and Barclays accounts constituted insider trading.  Specifically, the SEC alleges that the traders who made the purchases on June 26, 27, and 28 did so after they were tipped about Amgen's offer to buy Onyx.  (*Id.* ¶¶ 30–34.)  The same day that the SEC filed this action, Judge Jed S. Rakoff, in his capacity as Part I judge, temporarily froze the traders' assets related to the purchases in question and ordered them to appear and show cause why the freeze should not be continued for the duration of this case.  (Dkt. No. 3.)  The three declarations submitted in support of the freeze order application mirrored the allegations in the complaint, except that the declaration of Andy Ganguly, a Staff Accountant for the SEC, contained more data about the number of Onyx call options that had been sold each day over the preceding few weeks.  (Dkt. Nos. 28–30.)  The traders did not file an opposition or appear to show cause, and on July 10, this Court issued a freeze order which remains in effect.  (Dkt. No. 4.)

In the meantime, the law firm DLA Piper had contacted the SEC to inform it that the firm represented two traders who had made the trades using the Citigroup account.  (Bulgozdy Decl. ¶ 4.)  DLA Piper eventually revealed the identities of those traders to be Dhia Jafar and Omar Nabulsi, both of whom are residents of Dubai.  (*Id.* ¶ 5.)  Jafar and Nabulsi contend that Citigroup has improperly frozen all of their assets in the Citigroup account, not just the proceeds from the trades at issue.  (Defs.' Mem.[3] at 8, Dkt. No. 21.)  The movants and the SEC provide slightly different accounts of their efforts to work together to clarify the scope of the freeze

---

[3] Although the complaint does not name Jafar or Nabulsi as a Defendant, their filings are cited as filed by "Defs."

order; in short, the parties were unable to agree on clarifying language because either Citigroup or the SEC was unsure about the amount of money that represented proceeds from the trades in question. (*Id.* at 8–9; Bulgozdy Decl. ¶¶ 7, 10.) The SEC has not amended the complaint to name Jafar or Nabulsi as a Defendant.

Jafar and Nabulsi filed this motion on July 23, 2013, and requested an expedited schedule for briefing and oral argument. (Dkt. Nos. 17, 33.) The Court scheduled the motion to be fully briefed by August 12, 2013, and held oral argument via telephone on August 14, 2013. (Dkt. No. 31.) Jafar and Nabulsi move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim. (Dkt. No. 17.) In the alternative, they seek to modify the freeze order to clarify that it is limited to the $2,527,295 in profit attributable to the Onyx trades in question. (*Id.*)

## II.     Discussion

### A.     Sufficiency of the Complaint

#### 1.     Pleading Standard

The pleading standard for an insider trading claim is not straightforward. The Court must begin with the general pleading standard, Federal Rule of Civil Procedure 8, which requires a complaint to make a short, plain statement of a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To determine whether a complaint satisfies Rule 8, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Id.* But the court need not accept "[t]hreadbare recitals of the elements of a cause of action," which are essentially legal conclusions. *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). After separating legal conclusions from well-pleaded factual allegations, the court must determine whether those facts make it plausible—not merely possible—that the defendants acted unlawfully. *Id.*

Insider trading claims are also subject to Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) allows a party to allege a person's state of mind in general terms, but otherwise requires that circumstances constituting fraud be stated "with particularity."  This rule is intended to provide defendants with fair notice of the plaintiff's claim, to discourage plaintiffs from making a cavalier decision to accuse a defendant of fraud, and to protect defendants from strike suits.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F. 3d 87, 99 (2d Cir. 2007) (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.2004)).  Rule 9(b) is more demanding than Rule 8, but it does not replace Rule 8.  The rules must be read in conjunction with one another. Wright & Miller, Fed. Prac. & Proc.: Civil 3d § 1298 (2004 & Supp. 2013); *see United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (applying *Iqbal* to claims subject to Rule 9(b)); *In re Xethanol Corp. Secs. Litig.*, No. 06 Civ. 10234 (HB), 2007 WL 2572088, *2 (S.D.N.Y. Sept. 7, 2007) (applying *Twombly* and Rule 9(b) to claims under § 10(b) of the Exchange Act).

In most cases, pleading fraud with particularity requires the plaintiff to specify the person who made the misrepresentation, the time and place of the misrepresentation, the content of the misrepresentation, and the reasons the misrepresentation was fraudulent.  *See Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197–98 (2d Cir. 2013) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  But because insider tips are typically passed on in secret, it is often impractical to require plaintiffs to allege these details with particularity.  Instead, Rule 9(b) may be relaxed to allow a plaintiff to plead facts that imply the content and circumstances of an insider tip.  *SEC v. Aragon Capital Advisors, LLC*, No. 07 Civ. 0919 (FM), 2011 WL 3278907, at *10 (S.D.N.Y. July 26, 2011) (quoting *SEC v. Alexander*, 160 F. Supp. 2d 642, 649 (S.D.N.Y. 2001)); *see also In re Global Crossing, Ltd. Secs. Litig.*, No. 02 Civ. 0910 (GEL), 2005 WL 2990646, at *10 (S.D.N.Y. Nov. 7, 2005) (comparing approaches to

Rule 9(b) in insider trading cases).  This relaxation should not completely eliminate the rigors of Rule 9(b).  Each of the cases in this Circuit relaxing Rule 9(b) ultimately relies on *Segal v. Gordon*, 467 F.2d 602 (2d Cir. 1972), which held that "[w]hile the rule is relaxed as to matters peculiarly within the adverse parties' knowledge, [] allegations [on information and belief] must then be accompanied by a statement of the facts upon which the belief is founded."  467 F.2d at 608 (citing 2A James Wm. Moore, Moore's Fed. Prac. ¶ 9.03, at 1928–29 (2d ed. 1968)).  Rule 9(b) is therefore relaxed only to the following extent: if a tip took place under circumstances known only to the defendant and the tipper, the plaintiff may plead a belief about the content and the circumstances of the tip, coupled with particular facts supporting that belief.

As opposed to other circumstances constituting fraud, states of mind may be pleaded "generally" under Rule 9(b).  This provision is not "license to base claims of fraud on speculation and conclusory allegations."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).  Instead, a general allegation about the defendant's state of mind must be supported by specific facts that strongly support an inference[4] of fraudulent intent.  *Id.* (citing *Mills*, 12 F.3d at 1176).  The inference may be supported by the defendant's motive and opportunity to defraud, or

---

[4] The Second Circuit has applied the "strong inference" standard for pleading states of mind under Rule 9(b) since the 1970s.  *See Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir. 1979).  Congress adopted this standard in the Private Securities Litigation Reform Act (PSLRA) in 1995.  15 U.S.C. § 78u-4(b)(2)(A).  The Supreme Court has interpreted "strong inference" as used in the PSLRA to have different meaning than "strong inference" as defined by the Second Circuit.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("While adopting the Second Circuit's 'strong inference' standard, Congress did not codify that Circuit's case law interpreting the standard.").  Because the PSLRA applies only to private securities litigation, the Supreme Court's interpretation of "strong inference" as used in the PSLRA does not apply to SEC enforcement actions.  *SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) ("[H]ad Congress wanted the PSLRA to restrain the SEC's ability to plead securities fraud, it could have said so easily.").  This opinion applies the Second Circuit's pre-PSLRA "strong inference" standard, not cases interpreting "strong inference" as used in the PSLRA.  For a thorough discussion of this issue, see *Dunn*, 587 F. Supp. 2d at 499–502.

by other facts showing that the defendant acted knowingly or recklessly. *See id.* (citing *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268–69 (2d Cir. 1993)). In a somewhat confusing elaboration of this standard, the Second Circuit has also held that a complaint subject to Rule 9(b) should be allowed to survive a motion to dismiss based on "fairly tenuous inferences" of intent, because intent is a fact that a jury should find. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (citing *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)). Nevertheless, it appears that complaints under Rule 9(b) are simultaneously subject to the "strong inference" standard. *See id.* (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

In sum, to state an insider trading claim, the SEC must make particular factual allegations supporting a reasonable inference that the defendants violated Section 10(b) and Rule 10b–5. If facts about the content or circumstances of an insider tip are known only to the defendant and the insider, the SEC may plead a belief about the tip coupled with particular facts supporting that belief. The SEC's allegations must strongly support an inference that the defendant acted with intent to defraud.

### 2. Elements of an Insider Trading Claim Under Section 10(b) and Rule 10b–5

Section 10(b) of the Securities Exchange Act forbids the use of "any manipulative or deceptive device or contrivance in contravention of" rules adopted by the SEC, if such use is "in connection with" securities trading. 15 U.S.C. § 78j(b). The SEC adopted Rule 10b–5 to prohibit, among other things, the use of an instrumentality of interstate commerce to "engage in any act . . . which operates . . . as a fraud or deceit upon any person" in connection with securities trading. 17 C.F.R. § 240.10b–5. Insider trading violates these laws. *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012) (citations omitted). The Supreme Court has recognized two types

of insider trading.  First, under the classical theory, a corporate insider trades shares of that corporation using material nonpublic information in violation of the duty of trust and confidence that corporate insiders owe to shareholders.  *Id.* (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  Second, under the misappropriation theory, a corporate insider shares material nonpublic information with a person who secretly misappropriates the information for personal gain in the securities market, in violation of a fiduciary duty[5] to the insider.  *Id.* at 284–85 (citing *United States v. O'Hagan*, 521 U.S. 642, 652 (1997); *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991) (*en banc*)).  Under both theories, the fiduciary duty of trust and confidence requires the person who knows material nonpublic information either to abstain from trading on the information or to make a disclosure before trading.  *Dirks v. SEC*, 463 U.S. 646, 654 (1983) (citing *Chiarella*, 445 U.S. at 227–235) (classical theory); *O'Hagan*, 521 U.S. at 655 (misappropriation theory).  An insider can avoid liability by disclosing the relevant information publicly so that she is not at a trading advantage over the corporation's shareholders.  *Dirks*, 463 U.S. at 654.  A misappropriator can avoid liability by disclosing the fact that she will be trading on confidential information to her source; by doing so, the misappropriator is no longer deceiving her source, and thus she is not violating § 10(b).  *O'Hagan*, 521 U.S. at 655.

  The classical and misappropriation theories extend liability to tippers who share inside information with another person for trading purposes, and to tippees who trade on the information.  *Obus*, 693 F.3d at 285.  A tipper is liable for insider trading if she has a duty to keep material nonpublic information confidential, she tips someone who could use the

---

[5] The key element to any misappropriation case is a fiduciary relationship, or a functional equivalent, between two parties.  *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) (Sotomayor, J.).  The SEC adopted Rule 10b5–2 to define three categories of cases giving rise to an actionable fiduciary duty.  17 C.F.R. § 240.10b5–2; *see SEC v. Conradt*, __ F. Supp. 2d __, 2013 WL 2402989, at *5 (S.D.N.Y. June 4, 2013).  The SEC's allegations in this case do not go into enough detail to warrant discussion of the different circumstances giving rise to an actionable duty.

information in connection with securities trading, and she personally benefits from giving the tip. *Id.* at 289.  By secretly exploiting material nonpublic information for personal gain, the tipper deceptively breaches her duty to shareholders (classical theory) or her source (misappropriation theory), violating § 10(b).  *See id.* at 286.  The personal benefit to the tipper can be any type of benefit, including the satisfaction of making a gift to a relative or friend.  *Dirks*, 463 U.S. at 663–64.

A tippee's liability is derivative of a tipper's liability; absent a breach of duty by the tipper, there can be no derivative breach by the tippee.  *Id.* at 662.  A tippee incurs liability for a tipper's breach if he knows or has reason to know that the tip was passed on in violation of a fiduciary duty, and he knows that the tip is material nonpublic information, but he nevertheless trades on the information or tips the information for his own personal benefit.  *Obus*, 693 F.3d at 286–89.  The tippee is said to inherit the tipper's duty to abstain from trading or make the appropriate disclosure.  *Id.* at 288.

As this discussion has suggested, the requisite state of mind for all the foregoing theories of liability is scienter.  *Id.* at 286 (citing *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 167–68 (2d Cir. 1980)).  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976).  Negligence does not rise to the level of scienter, *id.*, but recklessness is sufficient in this circuit and ten others, *Obus*, 693 F.3d at 286 (citing *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998)).  In this context, reckless disregard for the truth is "highly unreasonable" conduct that is an "extreme departure from the standards of ordinary care."  *Id.* (quoting *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998)).  "In every insider trading case, at the moment of tipping or trading, just as in securities fraud cases across the board, the unlawful actor must know or be reckless in not knowing that [his] conduct [is] deceptive."  *Id.*  Therefore, a tipper incurs liability for insider

trading only if she (1) knowingly or recklessly tips (2) information that she knows, or is reckless in not knowing, to be material and nonpublic (3) in knowing or reckless violation of a duty to keep the information confidential (4) for personal gain. *Id.* at 286–89. A tippee incurs liability if all of those conditions obtain, plus (1) the tippee knows or is reckless in not knowing that the tip is material nonpublic information, (2) the tippee knows or should know[6] that the tip was in breach of a fiduciary duty, and (3) the tippee intentionally or recklessly uses the information by trading or tipping for personal benefit. *Id.*

### 3.   Application

#### a.   Well-Pleaded Factual Allegations

The SEC's well-pleaded factual allegations establish three main points. First, there was material nonpublic information to be tipped. Amgen's offer was a trustworthy sign that Onyx's stock was significantly undervalued. Onyx's rejection of the offer suggested that even $120 a share was an underestimation of Onyx's true worth. There can be no real debate that the complaint adequately alleges the materiality of this information; immediately following the formal announcement, Onyx's stock jumped 51% in value.

Second, the traders using the Citigroup and Barclays accounts placed substantial bets that, by late July, Onyx's stock would rise above values ranging from $80 to $92.50 a share. These bets were placed starting the same day that Onyx's directors voted to reject Amgen's offer. Onyx's stock rose above $130 a share less than a week later.

---

[6] In *Dirks*, the Supreme Court held that a tippee incurs liability if he "knows or should know" that the tipper breached a fiduciary duty. 463 U.S. at 660. This standard is very similar to negligence, but negligence is generally an insufficiently culpable state of mind for securities fraud. *See Ernst & Ernst*, 425 U.S. 185. The Second Circuit has resolved this tension by limiting the "knows or should know" standard to apply only to the tippee's knowledge that the tipper breached a fiduciary duty. *Obus*, 693 F.3d at 288. For all other elements of tippee liability, scienter applies. *Id.*

Third, the details of Amgen's offer somehow made their way into the Financial Post before Onyx formally announced the offer.

From these main points, the SEC asks the Court to infer the elements of tippee liability. The SEC does make direct allegations about the elements of tippee liability, but these allegations cannot be characterized as well-pleaded factual allegations, and the Court is not bound to accept them as true. The complaint alleges "upon information and belief" that the Defendants were tipped, that the tipper expected to receive a benefit, and that the Defendants "knew, recklessly disregarded, or should have known" that their trades were in breach of a fiduciary duty, "and/or" that they had been tipped in violation of a fiduciary duty. (Compl. ¶¶ 31–33.) These allegations are all belief and no information. Unless such beliefs can be reasonably inferred from the well-pleaded factual allegations, they amount to a "threadbare recital[]" of the elements of tippee liability that does nothing to nudge the SEC's claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 663, 680 (quoting *Twombly*, 550 U.S. at 570).

Nor is the Court bound to accept the SEC's characterization of these trades as "risky" and "highly suspicious." (*See, e.g.*, Compl. ¶ 5.) Calling these trades highly suspicious is tantamount to saying that the trades strongly support an inference of insider trading—that is a legal conclusion, not a fact, and it is a conclusion that is not supported by facts alleged in the complaint.

### b.    Reasonable Inferences

The complaint argues that the trades were highly suspicious based on their "timing, size, and profitability," the riskiness of the options involved, and the fact that no trader had used the Citigroup account to buy Onyx call options in the previous year. (*Id.* ¶ 28.) Some of these circumstances do raise mild suspicion. The Citigroup account's trading history (or lack thereof) in Onyx call options could raise suspicion if the Court inferred that the account was the sole

12

means of securities trading for each trader using the account.  Furthermore, the timing and profitability of the trades raise suspicion in tandem—one circumstance is not suspicious without the other[7]—and together, they do have the potential to raise "high suspicion" in conjunction with other circumstances.  But the complaint does not present other suspicious circumstances.

The size of the trades is not informative for several reasons.  The SEC makes much of the fact that, for example, the purchase of 50 July $90 call options on June 28, 2013 was a 138% increase in the average number of the same call options (21) sold each day since the options were first sold on May 23, 2013.  (*Id.* ¶ 7.)  The SEC does not indicate whether this average is actually representative of the amount of options that sold per day between May 23 and June 28, or whether the options were purchased in chunks, punctuated by long periods of inactivity.  For example, this average would result if almost nobody bought July $90 call options until the end of June, and then traders purchased (say) 75 call options per day during the two weeks leading up to June 28.[8]  The historical average also fails to convey whether, on the same day as the trades in question, other investors decided to purchase the same call options: even if the trades in question were a significant jump from the previous week's activity, the trades would be less suspicious if

---

[7] It would not be suspicious if a trader bought options that immediately turned a modest profit, or if a trader bought options that turned a significant profit over a long period of time.

[8] The complaint itself demonstrates how these averages can be misleading.  The SEC alleges that traders bought 544 July $85 call options on June 27, 2013, a "1,294% increase" over the average daily volume of 39.  (Compl. ¶ 24.)  But the complaint also alleges that the day before, on June 26, 2013, a trader bought 175 July $85 call options.  (Compl. ¶ 22 (the Court assumes that "June 26, 2012" is a typo).)  In this instance, the average daily volume of 39 was not representative of recent trading activity.

other traders were making the same investment.[9]  The historical average therefore communicates insufficient information about whether the trades at issue were unusual in the context of recent trading activity.  The SEC also fails to indicate whether it was unusual for the average number of July call options sold per day to spike near the end of June.  Without clarification about the distribution of past trades, other trading activity on the days in question, or trends in average daily volume as a call option's expiration date approaches, the historical average daily volume is not a basis for inferring that the trades in question were suspicious.

Even if these purchases were unusually large, that information would not bear significant weight.  The accounts in question were omnibus accounts.  (*Id.* ¶ 12.)  Without background knowledge about the number of traders using the account and their individual trading habits, the total amount of Onyx call options purchased through the account does little to raise suspicion of insider trading.

Finally, these trades were not risky enough to be characterized as "highly suspicious."  Onyx's stock had only recently dipped below $85 a share before the trades at issue.  The stock had closed at over $90 a share between April 9 and June 3, 2013, and at over $85 a share between June 3 and June 19, 2013.[10]  The trades at issue were bets that Onyx's stock would hit values ranging from $80 to $92.50 a share in late July—not an outrageous bet to make.  While these trades did carry some risk, all securities trades do.

---

[9] The SEC characterizes the June 27 purchase of 544 July $85 call options as a "highly suspicious" 1,294%  increase over the historical average daily volume of 39, yet also concedes that approximately 300 July $85 call options were sold to at least one other account the same day.  (*See* Compl. ¶¶ 23–24.)  The complaint does not provide similar information about same-day activity for any of the other trades in question.

[10] Courts may take judicial notice of public stock price quotations without converting a motion to dismiss into a motion for summary judgment.  *Rinehart v. Akers*, 722 F.3d 137, 149 n.9 (2d Cir. 2013) (quoting *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 985 (7th Cir. 2013)).



Taken as a whole, the circumstances surrounding these trades raise only mild suspicion. The SEC's other main points—the material information about Amgen's offer and the apparent leak to the Financial Times—are not enough to bridge the gap from possible to plausible tippee liability.

Primarily, the allegations are insufficient to imply that anyone tipped the Defendants. The SEC has not identified a person or a limited group of people who might have been the tipper.  The SEC has not alleged a preexisting relationship between the Defendants and Amgen or Onyx that might be a basis for inferring that a tip had been passed on.  The SEC has not identified records of any communication between a potential tipper and the Defendants.  And the SEC has not identified a pattern of trading behavior that belies the Defendants' knowledge about specific steps in the negotiation process. *Compare SEC v. Suterwalla*, 2008 WL 9371764, at *4 (S.D. Cal. Feb. 4, 2008) (tippee made twelve different trades keyed to confidential events such as conference calls).  In the absence of these allegations or any other allegations supporting a link between the Defendants and a tipper, the SEC has failed to meet the Rule 9(b) standard requiring

15

particularized facts to constitute the "information" portion of the "information and belief" on which its allegations are based.

Moreover, the SEC has failed to allege facts that raise a strong inference of scienter. Even if there was a tip—which it is not reasonable to infer from these facts alone—the SEC's allegations do not support a reasonable inference that the tip was in violation of a fiduciary duty, much less that the Defendants knew or should have known about the violation.  The complaint does not contain any allegations about the confidentiality of the Amgen offer or the efforts, if any, that either company made to keep the offer secret.  Yet the SEC asks the Court to infer that someone tipped the Defendants about the Amgen offer, and on that basis, to infer that the tipper was deceptively breaching a fiduciary duty, then on that basis, to infer that the Defendants knew or were reckless in not knowing that the tip (whatever its content) consisted of material nonpublic information, and that Defendants knew or should have known that the tipper (whoever she was) breached a fiduciary duty by passing on the tip.  Piling inference upon inference in this way does not provide the requisite strong support for the inference that the Defendants acted with scienter.  *See Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994) (citing *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987) (holding that Rule 9(b) demands "some factual basis for conclusory allegations of intent"); *cf. SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) (vacating a preliminary injunction: "the record discloses [] unusual trading by [the defendants] on the eve of the merger announcement. They may well have had inside information, but possession of such information without more does not give rise to a duty to disclose or abstain from trading, at least where the recipient of the information is an ordinary investor." (citation omitted)).

The SEC argues that it need not allege these details.  The SEC's opposition brief cites decisions holding that the SEC stated a claim for tippee liability without identifying a particular

tipper, and in another string citation, cases holding that the SEC stated a claim without alleging the specific content of the tip.

While it is not strictly necessary that a complaint specify either of these details, it is necessary that the allegations as a whole support a reasonable inference as to each element of tippee liability.  The complaint must sketch the outlines of an unlawful trade.  Although the SEC need not paint in fine detail, the allegations must provide enough information such that, stepping back, the Court can see a comprehensible picture of insider trading.  Thus, in each of the SEC's cases lacking details about the content of the tip, attendant circumstances nevertheless made it reasonably clear that there was an actual tip consisting of material nonpublic information.  *Aragon Capital Advisors, LLC*, 2011 WL 3278907 at *12 (tipper admitted to tipping material nonpublic information in a plea allocution); *SEC v. Gad*, No. 07 Civ. 8385 (GEL), 2007 WL 4437230, at *1–*2 (S.D.N.Y. Dec. 17, 2007) (tipper in possession of confidential third quarter financial results had series of phone calls with tippee; tippee initiated trades within minutes of the final call); *Alexander*, 160 F. Supp. 2d at 646–49 (on more than one occasion, tipper who knew about merger negotiations called her boyfriend, who soon thereafter called tipper's attorney, who soon thereafter purchased call options; boyfriend and attorney also called their friends, who soon thereafter purchased stock and call options).

Likewise, although it is not strictly necessary to identify a tipper, complaints cited by the SEC that did not identify a tipper[11] contained enough information about other aspects of the

---

[11] The SEC cites *SEC v. Ginsburg*, 2000 WL 1299020 (S.D. Fla. Jan. 10, 2000), as authority holding that the SEC need not identify a tipper to survive a motion to dismiss.  While *Ginsburg* does mention that proposition as dictum in a footnote, the tipper was actually identified in that case.  At *1, *2 n.2.  The SEC also cites *Unifund* for the same proposition.  *Unifund*'s holding concerned the standard for preliminary injunctive relief, not the sufficiency of the complaint.  910 F.2d 1028.  Furthermore, *Unifund* held that in the absence of an identified tipper, the SEC could not "bridge [the] fundamental gap in its evidence with speculation," and thus the SEC was entitled to no more than a thirty-day freeze order.  At 1040, 1042.

unlawful trades to reasonably imply a limited class of tippers.[12]  *Suterwalla*, 2008 WL 9371764 at *4 (tippee made twelve different trades keyed to confidential events such as conference calls); *SEC v. Lambert*, 38 F. Supp. 2d 1348, 1349 (S.D. Fla. 1999) (tippee purchased stock after attending football game in a suite with principals representing company in merger); *Energy Factors Inc. v. Nuevo Energy Co.*, 1992 WL 170683, at *1–*2 (S.D.N.Y. July 7, 1992) (tippee company had "close and continuing relationship" with company whose stock it bought; multiple phone calls from President's office to tippee company shortly before stock purchase).  Each of the foregoing complaints was lacking an important detail, but the complaints compensated for that shortcoming with other allegations that supported an inference to fill in the blanks.  *See also SEC v. Kueng*, No. 09 Civ. 8763 (BSJ), 2010 WL 3026618, at *1, *3 (S.D.N.Y. Aug. 2, 2010) (holding that tip was so detailed that it supported an inference to the defendant's scienter); *cf. SEC v. One or More Unknown Purchasers of Securities of Telvent GIT, SA*, 2013 WL 1683665, at *1 (S.D.N.Y. Apr. 13, 2013) (SEC moved to dismiss its own enforcement action because it was "unable to identify the source of any material, non-public information relating to the transactions").

---

[12] One case cited by the SEC, *SEC v. Heider*, No. 90 Civ. 4636 (CSH), 1990 WL 200673 (S.D.N.Y. Dec. 4, 1990), upheld a complaint that failed to identify a limited class of tippers.  The complaint in that case alleged that the defendants' securities trades "have operated, are operating and will operate as a fraud or deceit upon certain individuals and entities, including but not limited to [the merging companies], from which material nonpublic information was misappropriated, received or otherwise improperly obtained in breach of a fiduciary duty of trust and confidence."  *Id.* at *1.  *Heider* held that these allegations satisfied Rule 8, relying on *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957) (holding that a court cannot grant a Rule 12(b)(6) motion unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").  *Heider* at *2.  Subsequent Supreme Court cases have made it clear that bare-bones allegations like those in *Heider* do not satisfy Rule 8.  *See Iqbal*, 556 U.S. at 678–79.  To the extent that *Heider* held such allegations to be particular enough to satisfy Rule 9(b), this Court simply must disagree.

In contrast, the factual allegations in this case are insufficient to support a reasonable inference of insider trading. There is no indication that the SEC knows whether material nonpublic information was tipped, who did the tipping, or who received the tip. It is impossible to infer that the Defendants acted with a culpable state of mind in the absence of that information. "A complaint alleging fraud should be filed only after a wrong is reasonably believed to have occurred; it should serve to seek redress for a wrong, not to find one." *Segal*, 467 F.2d at 607–08. This complaint appears to have been filed in search of a liable tippee. The complaint must be dismissed.

### c.      Leave to Amend

The SEC has requested permission to amend the complaint if the Court grants this motion to dismiss. (Pl.'s Opp. at 8.) Leave to amend a complaint must be "freely given when justice so requires." Fed. R. Civ. P. 15(a). When a court grants a motion to dismiss, it is often appropriate to grant leave to amend the complaint—particularly when Rule 9(b) applies. *ATSI*, 493 F.3d at 108 (citing *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)). Leave to amend may be denied if amendment would be futile. *Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, filing an amended complaint would not be necessarily futile. The SEC may file an amended complaint within thirty days of the date of this opinion and order.

### B.      Appropriate Scope of the Asset Freeze Order

#### 1.      Legal Standard

District courts enjoy general equity powers under Section 27 of the Securities Exchange Act of 1934. *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972)). Once these powers are invoked by a showing of a securities law violation, the court has the power to order all equitable relief necessary,

including an asset freeze.  *Id.* (citations omitted).  An asset freeze is intended to preserve funds that a defendant may be ordered to pay if he is held liable.  *Id.* (citing *Unifund*, 910 F.2d at 1041).

Section 21(d) of the Securities Exchange Act requires courts to grant the SEC's application for injunctive relief "upon a proper showing."  15 U.S.C. § 78u(d)(1).  The standard for an asset freeze is not as high as the usual standard for a preliminary injunction; rather, the SEC is required to show either a likelihood of success on the merits or that "an inference can be drawn" that the defendant violated federal securities law.  *Smith*, 653 F.3d at 128 (citing *SEC v. Byers*, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *3 (S.D.N.Y. Aug. 8, 2011)).  The decision to freeze assets, or to modify an asset freeze, is committed to the district court's discretion.  *Id.* at 127 (citing *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 438 (2d Cir. 1987)).  A district court exercising that discretion should consider the type of relief sought by the SEC when evaluating the likelihood of success on the merits.  *Id.* at 128 (*citing Unifund*, 910 F.2d at 1039).  Asset freeze orders are less burdensome on defendants than other types of injunctive relief; for that reason, the required showing of success on the merits (or a permissible inference) is lower, especially if the freeze order is limited in duration.  *See Unifund*, 910 F.2d at 1039, 1041 (citing *SEC v. Levine*, 881 F.2d 1165, 1177 (2d Cir. 1989)) ("[A]n ancillary remedy may be granted, even in circumstances where the elements required to support a traditional SEC injunction have not been established, . . . and such a remedy is especially warranted where it is sought for a limited duration.").  The district court may assess any relevant circumstance to determine the coverage, terms, and duration of an asset freeze, if one is appropriate.  *SEC v. Unifund SAL*, 917 F.2d 98, 99 (2d Cir. 1990), *denying pet. for reh'g of* 910 F.2d 1028.

The Second Circuit has suggested that an asset freeze order may be sustained even if the SEC has failed to state a claim.  In *Unifund*, the Defendants in an SEC enforcement action

appealed the district court's order (1) enjoining future violations of § 10(b) and Rule 10b–5 and (2) freezing their accounts, subject to trading approved by the SEC. 910 F.3d at 1029. The Circuit vacated the injunction prohibiting future securities fraud, holding that the SEC asked the Court to infer the necessary relationship between an unidentified tipper and the Defendants from "wholly inadequate circumstances." *Id.* at 1040. Yet when it came to the freeze order, the Court held that the SEC had demonstrated "*a* basis to infer" insider trading, which was enough to affirm a time-limited freeze order. *Id.* at 1041 (emphasis added). While the Court in *Unifund* did not rule on the sufficiency of the complaint, the Court's holding suggested that so long as there is "*a* basis to infer" liability, a limited freeze order is appropriate to preserve the SEC's opportunity to prove its case. *Id.* (emphasis added) ("[W]hile the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged.") But if the SEC's evidence is especially weak, the freeze order should be correspondingly limited. *Cf. Unifund*, 917 F.2d at 99 ("[I]n view of the Commission's meager showing on the merits, we concluded that the Commission would have to face the choice of either proceeding to trial rapidly with the benefit of the freeze order or preparing for trial beyond our thirty-day limit without the freeze order." (quotation marks and citation omitted)).

### 2.    Application

Although the complaint does not allege particular facts about the circumstances of the alleged fraud, or facts that support a strong inference of scienter, the SEC has nevertheless demonstrated a basis—however tenuous—for a possible inference that the Defendants are liable as tippees. The SEC originally submitted three declarations in support of its application for a freeze order. (Dkt. Nos. 28–30.) To the extent that the information in these declarations is

relevant to the merits of the SEC's claim, the information is alleged in the complaint—with the exception of the data submitted with the declaration of Andy Ganguly, a Staff Accountant with the SEC.  (Dkt. No. 30.)  Exhibit 3 to Ganguly's declaration includes the volume of July $80, $85, $90, and $92.50 call options purchased each day between April 1, 2013 and July 1, 2013.  These data show that, with the exception of the July $90 call options, the size of the trades at issue was unprecedented during the weeks leading up to June 26–28.  But the data also show that the Defendants were not always alone: the trades at issue constituted 100% of the July $80 call options purchased June 26, but only 43% of the July $85 call options purchased the same day, 64% of the July $85 call options purchased June 27, 16% of the July $90 call options purchased June 28, and 57% of the July $92.50 call options purchased June 28.  This means that, on the same day as the trades in question, either one or two other traders purchased these call options in an unprecedented amount, or many other traders purchased these call options all at once.  It would be suspicious if just one or two traders made unprecedented purchases of these call options immediately preceding the announcement of Amgen's offer, but not if many traders did so.  *Cf. SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 421 (S.D.N.Y. 2001) (vacating a freeze order under similar circumstances; inferring from media speculation and a spike in trading volume that, when the defendants made their trades, "the word was out" about the confidential tender offer).

Jafar and Nabulsi, on the other hand, have filed declarations and other evidence that there is an innocent explanation for their trading.  Both Defendants claim that they generally choose highly speculative investments, and that they frequently invest large sums of money with varying degrees of success.  (Jafar Decl. ¶¶ 12–14, Dkt. No. 19; Nabulsi Decl. ¶¶ 9–11, Dkt. No. 20.)  The Defendants have submitted evidence to support this claim about their trading history.  (Jafar Decl. Ex. B; Nabulsi Decl. Ex. B.)  They explain that, in addition to the volume of call options

that had recently been purchased, they also considered the fact that Onyx stock usually experienced large single-day fluctuations, and that the stock had experienced a prolonged dip in June.  (Jafar Decl. ¶¶ 10–11; Nabulsi Decl. ¶¶ 17–20.)  Nabulsi had seen two positive media reports about Onyx.  (Nabulsi Decl. ¶¶ 12–13; 16.)  Finally, Jafar had noticed an increase in the market for Onyx Contracts for Difference early in the week of June 24, 2013, which both Jafar and Nabulsi took to be a sign that Onyx's stock price would soon increase.  (Jafar Decl. ¶¶ 15–18; Nabulsi Decl. ¶ 15.)

The SEC's evidence supports "an inference" of insider trading, even in the face of Jafar and Nabulsi's submissions.  The data in Ganguly's declaration strengthen the inference that Jafar and Nabulsi traded using inside information.  Although Jafar and Nabulsi are able to offer evidence in support of an alternative explanation, it is possible to infer from the size of their trades and the lack of other trading activity that they and the Barclays Defendants traded on inside information.  Yet this inference, while possible to draw, is not well-supported by the SEC's evidence.  The Second Circuit's approach in *Unifund* is instructive.  The Court will extend the freeze order for thirty days, during which the SEC may prepare an amended complaint.  If the SEC files an amended complaint that contains new allegations within thirty days, the freeze order will be extended pending further order of the Court.  Otherwise, the freeze order will be vacated and this case will be dismissed.

The Court also must resolve a dispute between the parties about the amount of money subject to the freeze order.  Jafar and Nabulsi concede that the Citigroup account contains $2,527,295 in proceeds from the trades at issue.  (Defs.' Mem. at 15.)  According to counsel for the SEC, Citigroup determined that $2,636,892.50 should be frozen, "based on [Citigroup's] own analysis of activity in the account in Onyx securities."  (Bulgozdy Decl. ¶ 10.)  Counsel further affirms that Citigroup "is continuing to analyze the activity, and may adjust this amount."  (*Id.*)

The SEC has not provided the Court with any information about how Citigroup concluded that $2,636,892.50 should be frozen, or any other basis for calculating the proceeds from the trades at issue.  The SEC has also failed to explain why Citigroup needs to perform an ongoing analysis on transactions that were completed more than four months ago.

The SEC's position that the freeze order need not be modified, yet Citigroup should be permitted to change the amount frozen unilaterally and without notice, is unpersuasive.  It is insufficient for the SEC to oppose modifying the freeze order on the ground that the $2,636,892.50 that Citigroup has chosen to freeze "roughly equates" to the $2,527,295 that Jafar and Nabulsi concede represents the actual proceeds from the trades at issue.  (Pl.'s Opp. at 15.) There is no reason to oppose a clear and accurate freeze order.  And although there is more than $2 million at stake, the Court would not characterize two sums with a difference of more than $100,000 as roughly equivalent.

## III.   Conclusion

For the foregoing reasons, Defendants' motion to dismiss the complaint is GRANTED without prejudice.  The SEC is granted leave to file an amended complaint without 30 days.

The Court's July 10, 2013 Order Freezing Assets and Granting Other Relief is hereby clarified to state that it applies to $2,527,295 of assets in the account held at Citigroup Global Markets, Inc. and/or its affiliates under the name FFA Private Bank SAL, account number 62301460.

The Clerk of Court is directed to terminate the motion at Docket No. 17.

SO ORDERED.

Dated: New York, New York
       November 21, 2013

_____
J. PAUL OETKEN
United States District Judge