## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| | : **13 Civ. 4645 (JPO)** |
| **Plaintiff,** | : |
| | : **FIRST AMENDED** |
| vs. | : **COMPLAINT** |
| | : |
| DHIA JAFAR a/k/a DHIA JAFFAR and OMAR NABULSI, | : **ECF CASE** |
| | : |
| **Defendants.** | : |
| | : |

Plaintiff Securities and Exchange Commission (the "SEC"), for its First Amended Complaint against defendants Dhia Jafar a/k/a Dhia Jaffar ("Jafar") and Omar Nabulsi ("Nabulsi"), alleges as follows:

### SUMMARY

1.      This is an insider trading case involving the purchase by defendants Jafar and Nabulsi of the securities of two companies, Life Technologies Corp. ("Life Technologies") in January 2013 and Onyx Pharmaceuticals, Inc. ("Onyx") in June 2013.

2.      Although months apart, Jafar and Nabulsi's trading in Life Technologies and Onyx followed the same pattern.  Over a very short period, Jafar and Nabulsi amassed large, speculative and highly leveraged positions in call options and securities called "contracts for difference" ("CFDs") on Life Technologies and Onyx.  These positions had the potential to appreciate substantially if there were a sudden upward movement of the underlying stock, but could lead to substantial losses if the price decreased.  Shortly after they accumulated their positions and after the market closed, a Canadian journal, the *Financial Post*, published online reports that revealed confidential information about the potential acquisitions of Life

Technologies and Onyx.  In both instances, the companies publicly responded to the articles before the next trading day.  Then, when the market opened, Jafar's and Nabulsi's highly-leveraged positions increased dramatically in value.  They acquired these positions in Life Technologies and Onyx securities with an initial outlay of about $486,000, and realized profits of more than $3.7 million.

3.      With respect to Life Technologies, Jafar and Nabulsi amassed substantial and leveraged positions in that company's securities in the span of minutes on January 17, 2013, about a half hour before the markets closed that day.  For instance, they purchased 1,000 contracts for a series of options that were set to expire the very next day.  Their purchases were the first trades in that series on that day and were the first purchases since January 15.  On the same day (January 17), they purchased CFDs on a total of 25,000 shares of Life Technologies stock.  Jafar and Nabulsi acquired these large positions in CFDs, which are essentially proxies for the underlying stock, on margin.  Their purchase of call options and CFDs on margin were leveraged bets that Life Technologies stock would increase.

4.      Less than two hours after they acquired these positions, and after the market closed on January 17, the *Financial Post* published an online article revealing confidential information about Life Technologies' nonpublic strategic discussions.  The next day, before the market opened, Life Technologies issued a press release confirming part of what the *Financial Post* had reported.  Life Technologies' stock jumped in reaction to the news, increasing 11% from its closing price the prior day.  Having traded the day before this information was revealed with an initial outlay of about $258,000, Jafar and Nabulsi then liquidated their positions on January 18, realizing combined profits on their known trades of more than $1 million.

5.      The timing and volume of the purchases of securities of Onyx in June 2013 by Jafar and Nabulsi is equally suspicious.  On Wednesday, June 26, 2013, Jafar acquired large positions in short-term call options on Onyx.  For one series of calls, he was the only purchaser for the entire trading day; and for the other series he purchased that day, his large order was about five times the volume traded in that series before he made his purchase.  Then, on Friday, June 28, Jafar doubled down, buying more of the same series of call options (at higher premiums), and amassing a large position of out-of-the-money calls in another series.  For one series of options Jafar purchased that day, the only other purchaser was a resident of the United Arab Emirates where both Defendants live; and Jafar was the largest single purchaser of the out-of-the-money options and accounted for more than half of the volume traded that day.  Meanwhile, also on June 28, Nabulsi purchased out-of-the-money call options and, as he had done in Life Technologies, purchased Onyx CFDs on margin.  Their speculative positions in Onyx securities were highly leveraged bets that Onyx's stock price would increase in a short period.

6.      After Jafar and Nabulsi amassed these positions, the *Financial Post* published an online article revealing confidential information about Onyx.  The *Financial Post* article was published after the market closed on Friday, June 28—that is, after Jafar and Nabulsi had made their purchases—and the article revealed confidential information about Onyx's strategic discussions with another company, including a $120-per-share offer to buy Onyx, which was about 38% more than Onyx's stock price at the time.  Over the weekend, while the markets were closed, Onyx issued a press release confirming that the offer had been made, but stating that Onyx had rejected the offer because it was "not in the best interest" of the company or its shareholders, and that it would consider "other proposals."  Onyx's stock price increased a

staggering 51% during trading on Monday, July 1.  Jafar and Nabulsi then liquidated their

positions, acquired with an initial outlay of about $228,000, and realized profits of more than

$2.7 million in less than a week.

7.     Upon information and belief, Jafar and Nabulsi were tipped material nonpublic

information about Life Technologies and Onyx in advance of their trading in those securities in

January 2013 and June 2013, respectively.  The confidential information about Life

Technologies and Onyx was closely held, and the companies took all reasonable steps to

maintain the confidentiality of their information.  Upon information and belief, the tipper

provided this highly confidential information to Jafar and Nabulsi in breach of a fiduciary duty to

the companies involved, or misappropriated the information from an individual with knowledge

of such information in violation of a fiduciary duty to an insider.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.     The SEC brings this action pursuant to the authority conferred upon it by Section

21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d).  The SEC

seeks permanent injunctions against the Defendants, enjoining them from engaging in the

transactions, acts, practices, and courses of business alleged in this First Amended Complaint,

disgorgement of all ill-gotten gains from the unlawful insider trading activity set forth in this

First Amended Complaint, together with prejudgment interest, and civil penalties pursuant to

Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.  The SEC seeks any other relief the Court

may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5).

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and

27 of the Exchange Act, 15 U.S.C. § 78u(d), 78u(e), and 78aa.

10.    Venue lies in this Court pursuant to Section 21(d), 21A, and 27 of the Exchange Act, 15 U.S.C. § 78u(d), 78u-1, and 78aa.  Certain of the acts, practices, transactions, and courses of business alleged in this First Amended Complaint occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.  During the relevant period, Onyx (ONXX) and Life Technologies (LIFE) securities were traded on the NASDAQ Stock Exchange ("NASDAQ"), and options on their stock trade on various stock options markets in the United States, including the New York Stock Exchange ("NYSE") and the Chicago Board Options Exchange ("CBOE").

## DEFENDANTS

11.    **Dhia Jafar**, born April 27, 1977 in Baghdad, Iraq, is a citizen of Belize who resides in Dubai, United Arab Emirates.  Jafar is the General Manager of Uruk Project Development Company, based in Dubai.  Jafar opened a trading account with FFA Private Bank (Dubai) in or about November 2007.  According to his passport, Jafar's full name is Dhia Yahya Dhia Al-Din Jaffar, and his account opening documents with FFA Private Bank also identify him as "Dhia Jaffar."  However, in his declaration filed in this proceeding, he identified himself as "Dhia Jafar."

12.    **Omar Nabulsi**, born November 20, 1974 in Amman, Jordan, is a resident of Dubai, United Arab Emirates.  Nabulsi is the CEO of Global Investments Ltd., a subsidiary of Ithmar Capital, based in Dubai.  Nabulsi is also the General Manager of another subsidiary of Ithmar, J&F Holdings LLC, also based in Dubai.  Nabulsi opened a trading account with FFA Private Bank (Dubai) in or about October 2012.  According to his passport, Nabulsi's full name is Omar Abbas Wajih Nabulsi.

<u>**RELEVANT ENTITIES**</u>

13.     **Life Technologies Corporation** develops biotechnology tools used by researchers and offers a broad range of products and services, including systems, instruments, reagents, and customer services.  Life Technologies is headquartered in Carlsbad, California. Life Technologies common stock trades on NASDAQ under the ticker symbol LIFE, and its options trade on various stock options markets in the United States, including the CBOE.

14.     **Thermo Fisher Scientific, Inc.** ("Thermo Fisher") is a science services company that serves customers within pharmaceutical and biotech companies, hospitals and clinical and diagnostic labs, universities, research institutions and government agencies, as well as in environmental and process control industries.  Thermo Fisher is based in Waltham, Massachusetts.  On April 15, 2013, Thermo Fisher announced that it had signed a definitive deal to acquire Life Technologies for $76 in cash per common share, or approximately $13.6 billion, plus the assumption of net debt at close.  Thermo Fisher's common stock trades on the NYSE under the ticker symbol TMO.

15.     **Onyx Pharmaceuticals Inc.** is a biopharmaceutical company engaged in the development and commercialization of cancer therapies.  Onyx is based in South San Francisco, California.  Onyx's common stock trades on the NASDAQ under the ticker symbol ONXX, and options on its stock trade on various stock options markets in the United States, including the NYSE and the CBOE.

16.     **Amgen Inc.** ("Amgen") is a biotechnology medicines company that discovers, develops, manufactures and markets medicines for grievous illnesses.  Amgen is based in Thousand Oaks, California.  In August 2013, Amgen announced that it was acquiring Onyx for $125 a share, or about $10.4 billion in cash.  Amgen's common stock trades on NASDAQ under the ticker symbol AMGN.

## FACTS

### A.    Defendants' Insider Trading in Life Technologies in January 2013

17.     Jafar and Nabulsi amassed a short-term, highly leveraged position in the securities of Life Technologies on January 17, 2013, mere hours before the *Financial Post* published an article online that revealed confidential, nonpublic information about Life Technologies.  These were substantial but risky bets that would pay out only if the price of Life Technologies increased in a very short period, but would have led to substantial losses if the price decreased.

18.     In response to the *Financial Post* article and a press release issued by Life Technologies on January 18 before the market opened, the value of the Defendants' well-timed trades increased dramatically the next day, January 18.  They reaped over $1 million with their highly leveraged one-day bets.

### 1.    The Highly Confidential, Nonpublic Nature of Life Technologies' Strategic Discussions

19.     Life Technologies took significant precautions to safeguard its confidential discussions about its strategic alternatives.  Life Technologies has an Insider Trading Policy that outlines the company's policies on insider trading and blackout periods.  This policy prohibits any individual from trading in the securities of the company if such individual has material, nonpublic information.  Each employee who joins Life Technologies must review the Insider Trading Policy and sign a certificate agreeing to the Insider Trading Policy, and each employee certifies annually that they understand and agree to the company's compliance policies, including the Insider Trading Policy.

20.     On January 1, 2011, Life Technologies retained investment banker Moelis & Company LLC ("Moelis") pursuant to a multi-year confidentiality agreement.

21.     In June 2012, at a regularly scheduled meeting of the board of directors of Life Technologies in Newport Beach, California, a potential leveraged buyout was presented to the board as part of the company's annual strategic review.

22.     In August 2012, the independent members of the board of directors retained Cravath, Swaine & Moore LLP ("Cravath") as independent legal counsel to the board.  In September 2012, the board also decided to retain Deutsche Bank Securities Inc. ("Deutsche Bank") to act as an independent financial advisor for Life Technologies to assist in a review of the company's strategic plan and potential strategic alternatives, including a sale of the company. Deutsche Bank was retained pursuant to a confidentiality agreement.

23.     On November 10, 2012, the board of directors of Life Technologies delegated to its Governance and Nominating Committee (the "G&N Committee") the authority to oversee the process for evaluating the company's strategic alternatives and the related activities of the company's management and its advisors.  Around this time, the review of potential strategic alternatives was assigned the code name "Project Liberty" to maintain its confidentiality.

24.     Life Technologies utilized strict procedures to maintain the confidentiality of Project Liberty within the company.  The code name Project Liberty was used to maintain its confidentiality, and all communications among the project team only referred to the potential transaction using this project name.  Knowledge about Project Liberty was restricted to a short list of employees of Life Technologies.  Each employee tasked to Project Liberty received specific written instructions about the requirement for confidentiality, was given instructions on how to maintain such confidentiality, and was prohibited from trading in Life Technologies stock from December 15, 2012 through February 7, 2013 (and thereafter due to developments in Project Liberty).  The board of directors of Life Technologies, including its G&N Committee,

received information about Project Liberty via BoardVantage, which is a secure, encrypted portal used by over half the Fortune 500.  BoardVantage consistently meets the security standards of enterprise IT departments, including those of global financial institutions.

25.     Life Technologies also utilized procedures to safeguard the confidentiality of Project Liberty outside the company.  Its investment bankers, Moelis and Deutsche Bank, were subject to confidentiality agreements.  On December 4, 2012, when Life Technologies' investment bankers began to contact potential buyers, the potential buyers were required to sign confidentiality agreements.  During December 2012, Life Technologies executed confidentiality agreements with Bain Capital, Blackstone Management Partners, Temasek Capital Management, Carlyle Investment Management, Kohlberg Kravis Roberts & Co., and TPG Global LLC.  On January 1, 2013, pursuant to the confidentiality agreements, these companies received access to a secure online data room that contained limited nonpublic information regarding Life Technologies, which was created specifically for the purpose of maintaining the confidentiality of the information and process.

26.     Back in 2011, Thermo Fisher had expressed an interest in acquiring Life Technologies, but that proposal was ultimately rejected.  In early 2013, a limited group of high level members of the management of Thermo Fisher revived internal discussions about the possibility of an acquisition of Life Technologies.  These discussions were highly confidential and were limited to a small group of about a dozen high level company executives, one partner at Thermo Fisher's regular outside counsel, and Thermo Fisher's antitrust counsel.

27.     On January 8, 2013, Life Technologies received an expression of interest from Thermo Fisher.  The expression of interest was initially made during a telephone call between the CEO of Thermo Fisher and the chairman and CEO of Life Technologies, and was followed

up with a letter of the same date between those two individuals.  In the letter, Thermo Fisher did

not state a specific price and only offered to "pursue a transaction at an appropriate valuation for

100% of Life Technologies' outstanding equity…."  The letter was labeled "Strictly Private &

Confidential."

28.     On January 13, 2013, Life Technologies' G&N Committee had a confidential

telephonic meeting with the company's advisors, Deutsche Bank and Moelis, to discuss the

telephone call and letter from Thermo Fisher.  The G&N Committee instructed Life

Technologies' CEO to call Thermo Fisher's CEO to inform him that Thermo Fisher's proposal

would be presented to Life Technologies' board for consideration in early February.

29.     On Wednesday, January 16, 2013, members of Life Technologies' board of

directors held a confidential conference call to discuss Thermo Fisher's expression of interest.

Attendance was limited to six directors, the CFO, the chief legal officer, and a partner from the

company's outside counsel, Cravath.

30.     Through the close of trading on the NYSE at 4:00 p.m. EST on Thursday, January

17, 2013, Life Technologies and its advisors, and Thermo Fisher and its advisors, had maintained

the confidentiality of their strategic planning and discussions.  All participants in the process

from Life Technologies were subject to confidentiality agreements and all appropriate steps had

been taken by Life Technologies to maintain the confidentiality of Project Liberty.  Similarly,

Thermo Fisher had taken appropriate steps to assure the confidentiality of its interest in Life

Technologies.

**2.     The Defendants' Large Purchases of Short-Term Call Options and
Leveraged CFDs on January 17, 2013**

31.     On Thursday, January 17, 2013, Nabulsi and Jafar made aggressive purchases of

short-term call options on Life Technologies, and purchased CFDs of Life Technologies on

margin.  Based on account records produced by their broker, FFA Private Bank, these were the Defendants' first purchases of securities of Life Technologies in their accounts at that brokerage firm.

32.    A call option is a security that gives the buyer the right to buy shares of a company's stock at a set price (the "strike price") for a set period of time, through the expiration date.  The price a buyer pays to purchase an option is the "premium."  An owner of a call option may elect to sell the option, or may exercise the option by paying the strike price and then keep or sell the underlying shares.  If a call option is not sold or exercised before its expiration date, it becomes worthless.

33.    Generally, a call option is a bet that the price of the underlying stock will increase before the option's expiration date.  A holder of a call option can make money exercising the option if the stock price increases above the total of the strike price and the per-share premium he paid for the option.  They are all-or-nothing bets—if the stock price falls below the strike price and the option expires, the holder loses his entire investment (*i.e.*, the premium paid to purchase the option).

34.    A CFD on a company's stock is a financial instrument tied to the value of the underlying stock.  In general terms, a CFD allows a trader to speculate on share price movements in the underlying security without actually owning the underlying shares.  CFDs do not trade in the United States, and therefore provide a means for individuals to trade in securities listed in the United States, without actually taking ownership of the shares in their own names.

35.    CFDs are especially risky when they are bought on margin.  A buyer purchases a security on margin when he borrows part or all of the purchase price, and uses, typically, the security or his other holdings as collateral.  By doing so, if the stock price falls, the buyer can be

subject to a "margin call," and can lose substantially more than his initial outlay for the security. Because they are so leveraged, buying a CFD on margin is an aggressive bet that the stock price will increase.

### a.   Jafar's Trading on January 17, 2013

36.   On Thursday, January 17, 2013—just hours before Life Technologies' strategic discussions were publicly revealed—Jafar purchased 500 January 55 call options.  His purchase order was executed at approximately 3:28 p.m. EST, just before the market closed at 4:00 pm EST.  These January 55 call options were due to expire the very next day, Friday, January 18. With these options, Jafar had the right to buy 50,000 shares of Life Technologies stock at a strike price of $55 per share.   He paid a volume-weighted average premium of $0.2495 for the contracts, for a total cost of $13,975.

37.   Jafar's late afternoon purchase of January 55 call options on Life Technologies was the first trade on January 17 in that series of options.  In fact, the January 55 call options had last traded on January 15; they did not even open or trade on January 16.

38.   The opening price of Life Technologies on January 17 was $53.78 per share, and it closed at $54.97 per share.  Because the January 55 call options were expiring the next day, Jafar's January 17th purchase of these options was a bet that the price of Life Technologies' stock would increase in just one day.  For Jafar to make money by exercising the options, Life Technologies' stock price had to increase to $55.25 per share (the strike price plus the premium) in 24 hours.  On the other hand, if the price stayed below $55 per share, as it was when the markets closed on January 17, Jafar would lose his entire investment of $13,975.

39.   Also on January 17, Jafar purchased 500 February 55 call options on Life Technologies at a premium of $2.00, and then sold 50 of the option contracts at a premium of

$2.60.  Jafar therefore had a net cost of $88,650 for the 450 February 55 call options on Life Technologies he acquired that day.

40.     These options were due to expire on Friday, February 15.  The 450 February 55 call options gave Jafar the right to buy 45,000 shares of Life Technologies stock at a strike price of $55 per share.  This position was another bet that the price of Life Technologies' stock would increase.  To make a profit by exercising these options, Jafar needed the stock price to increase to $57.60 per share, and if the stock price stayed below $55 per share, as it was at closing on January 17, he would lose the $88,650 he paid for the options.

41.     In addition, on January 17, Jafar purchased 10,000 CFDs on Life Technologies on margin through his FFA Private Bank.  Jafar's margin account was debited $54,970 for his 10,000 CFDs on Life Technologies, which would have represented a purchase price of approximately $55 per contract for the CFDs for a total of approximately $550,000.

42.     Each day the CFD position would be valued based on the market price of Life Technologies stock.  If the value of the CFDs increased because the underlying stock went up in price, then Jafar's margin account would be credited with an increase.  On the other hand, if the value of the CFDs decreased because the stock went down in price, then Jafar's margin account would be charged for the decrease.  If the CFDs declined in value substantially, Jafar could be subject to a margin call that would force him, for example, to either put up more cash or exit the position at a loss.

43.     Jafar's purchase of the CFDs on margin was yet another bet that Life Technologies' stock price would go up.  Because it was so leveraged, if the price increased, it could generate a significant return; but if the price fell, Jafar could lose a substantial amount of money.

### b.      Nabulsi's Trading on January 17, 2013

44.     Nabulsi also acquired call options and CFDs on margin on January 17 hours before confidential information about Life Technologies was publicly reported.

45.     Like Jafar, Nabulsi acquired a large position of January 55 call options on January 17.  After Jafar purchased these options at 3:28 p.m. EST, Nabulsi purchased 300 January 55 call options before the markets closed.  Nabulsi paid a premium of $0.34 for these options, for a total cost of $11,100.  These options were set to expire the following day, January 18.  They gave Nabulsi the right to buy 30,000 shares of Life Technologies stock at a strike price of $55 per share.

46.     Nabulsi also exercised power of attorney over an account held in the name of a third party at FFA Private Bank.  Nabulsi directed the purchase of 200 January 55 call options at a premium of $0.34 in that third party's account, for a total cost of $7,400.

47.     Because the January 55 call options were expiring the next day, Nabulsi's purchase of these options on January 17 was a one-day bet on the price of Life Technologies' stock.  For these positions to be profitable upon exercise, the price of Life Technologies stock had to increase above $55.34 per share in just one day, and if the price continued to stay below $55 per share, Nabulsi's whole investment of $18,500 (for both him and the third party account he traded in) would be wiped out.

48.     In addition, just like Jafar, Nabulsi purchased 10,000 CFDs on Life Technologies on January 17.  Nabulsi paid a price of $55.096 for these CFDs, for a total cost of $550,960.  Nabulsi purchased the CFDs in his margin account, which was debited $54,970 for the margin purchase.  The CFDs were a leveraged position, and exposed Nabulsi to potential losses beyond the original cost if the value of the underlying Life Technologies stock decreased.

49.     Nabulsi also directed the purchase of 5,000 CFDs on Life Technologies in the third party account at FFA Private Bank.  That purchase was also made on margin, at a price of $54.96 per contract, for a total cost of $274,800.  The third party's margin account was debited $27,485 for the purchase.

50.     By taking such large positions in CFDs on margin, Nabulsi was betting that Life Technologies' stock price would increase.  Because this position was so leveraged, this CFD position could generate huge returns if the stock price suddenly increased.  But a price decrease would also expose Nabulsi and the third party not only to the risk of losing their entire investment in the options in one day, but also to the possibility of a margin call on the CFDs.

**3.     The Release of Confidential Information about Life Technologies after the Market Closed on January 17**

51.     After the market closed on Thursday, January 17, 2013, at approximately 5:46 p.m. EST, the *Financial Post*, a Canadian journal published out of Toronto, posted an article that reported material nonpublic information about Project Liberty.  The article was written by Barry Critchley.  The online article was revised several times after it was issued.  One version was headlined "Life Technologies hires firms to drum up buyout, takeover interest."  Another version was headlined "Biotech being shopped."

52.     In that article, the *Financial Post* reported that "materials" seen by it showed that Life Technologies had started a process to sell the company, and the "hope is to wrap the sale up by the middle of February."  The article stated that the price "could be in the US$65-US$75 a share range."

53.     The *Financial Post* specifically referred to "documents" seen by the newspaper which identified Deutsche Bank and Moelis as investment bankers hired by Life Technologies to "drum up interest," and identified by name "four large private-equity firms" that had been

approached:  Blackstone, KKR, TPG Global and Carlyle Investment Management.  The article

specifically referred to "confidentiality agreements" that these firms had signed "last month,"

and that they had been given access to a "data room" pursuant to those agreements.

> **4.      Life Technologies' Reaction to the Unauthorized Disclosure of its Confidential Information**

54.      Life Technologies was surprised by the *Financial Post* article's report of the

company's confidential, nonpublic information.

55.      Life Technologies' board of directors convened a conference call within hours

after the *Financial Post* article appeared online to discuss the article.  The call was initiated at

6:00 pm PST on January 17, 2013, and the attendees included members of Life Technologies'

board, its CFO, chief legal officer, outside counsel, and representatives of Deutsche Bank and

Moelis.  The attendees discussed, among other things, how the article might be received in the

market, its effect on employees, and its effects on the Project Liberty process.  Outside counsel

advised the Board on certain legal considerations.

56.      Life Technologies' advisors recommended that it issue a press release relating to

certain issues in the article, and the board agreed that a release should be issued before the

opening of the market on January 18.  The board also decided that Life Technologies' investment

bankers should reach out to entities that had signed confidentiality agreements to inform them of

the article.  The board discussed with management and advisors the general text of a press

release and of a related statement to be issued to Life Technologies' employees.  The board

discussed with management and the outside advisors additional steps to be taken to improve the

confidentiality of Project Liberty.

57.      Executives of Life Technologies met after the board meeting during the evening

of January 17 to draft a public response to the *Financial Post* article.

58.     Life Technologies also contacted a corporate and financial communications firm, Sard Verbinnen & Co., to advise on how to respond to the *Financial Post* article.

59.     Before the market open on Friday, January 18, 2013, Life Technologies issued a two-sentence press release, which stated:  "The board of directors of Life Technologies Corp. has retained Deutsche Bank Securities Inc. and Moelis & Company LLC to assist in its annual strategic review.  The board of directors has not decided on any specific course of action."

**5.      The Defendants' Substantial One-Day Profits after Life Technologies Stock Price Soars on January 18**

60.     On Friday, January 18, the market reacted positively to the disclosure of Life Technologies' confidential information in the *Financial Post* article.  As the *Financial Post* subsequently reported in a January 19 article headlined "Life shares jump after report; Buyout Likely":  "Shares of California-based Life Technologies Corp. jumped more than 10% Friday after a Financial Post report disclosed that the US$9.5-billion company was exploring a possible sale."

61.     Life Technologies stock opened at $61.23 on January 18, an increase of $6.26 per share, or about 11%, from the prior day's closing price on January 17.  Volume of trading in the common stock of Life Technologies increased from 2.79 million shares on January 17 to over 16.3 million shares on January 18—about a 484% increase.  Life Technologies stock closed on January 18, 2013, at a price of $60.79 per share.

62.     On January 18, Defendants liquidated the options and CFDs they had bought on January 17.

63.     Jafar exercised 497 of his January 55 call options, converting them into 49,700 shares of Life Technologies purchased at a cost of $2,734,067.25.  Jafar then sold those 49,700 shares at an average price of $62.75916 (along with 25,000 shares he had purchased as a day

trade on January 18), for proceeds $3,119,130.25 from the 49,700 shares.  Jafar generated a one-day profit on these 497 January 55 call option contracts of over $371,000, on his initial investment for 497 contracts of about $12,400.

64.     Jafar sold the other 3 of his January 55 call options at a price of $5.60, for proceeds of $1,630.

65.     Jafar sold his 450 February 55 call options in four lots:  250 were sold at a price of $5.70, generating proceeds of $141,750; 100 were sold at a price of $5.90, generating proceeds of $58,700; 50 were sold at a price of $6.30, generating proceeds of $31,350; and 50 were sold at a price of $7.00, generating proceeds of $34,850.  Jafar generated a one-day profit on his 450 February 55 call options of about $178,000, on his net initial investment of about $88,650.

66.     Jafar liquidated his CFDs in Life Technologies at a profit of $59,120.

67.     Also on January 18, Jafar executed a day trade in Life Technologies securities, purchasing 25,000 shares at $60.37, and then selling them later that day in a block with the shares he had purchased by exercising 497 of his January options.

68.     Excluding the day trade, Jafar realized a one-day profit on his options of approximately $550,000 on his net initial investment of approximately $102,625.  Jafar realized a one-day profit of approximately $59,210 on his CFDs, on an initial outlay of about $54,970.  Jafar's profit from his one-day trade in Life Technologies securities in his known FFA Private Bank accounts (excluding the January 18 day trade of 25,000 shares) was approximately $609,000, on an initial total outlay of about $157,595.

69.     Nabulsi also liquidated the positions he had purchased in securities of Life Technologies on January 18.

70.     Nabulsi exercised 150 of his January 55 call options, and purchased 15,000 shares of Life Technologies at $55 per share for a cost of about $827,887.  Nabulsi then sold those 15,000 shares at a price of $64.0379 per share, or more than $9 per share above the exercise price of $55, for proceeds of about $957,206.  Nabulsi realized a one-day profit on these 150 call options of approximately $124,000, on his initial investment for these 150 contracts of $5,550.

71.     Nabulsi sold his remaining 150 January 55 call options at a price of $5.20, generating proceeds of $77,550.  Nabulsi realized a one-day profit on these 150 call options of approximately $72,450, on his initial investment for these 150 contracts of $5,550.

72.     Nabulsi sold his CFDs on January 18.  According to his CFD account statement from FFA Private Bank, Nabulsi liquidated his CFD position by purchasing 10,000 shares of Life Technologies at $55.096, at a cost of $550,960, and then selling those shares at a price of $60.76, for proceeds of $607,600.  Nabulsi's account statement shows a net profit of about $57,900 on his CFDs.

73.     Nabulsi realized a profit of over $196,000 on his one-day option investment of about $11,100, and realized a profit of about $57,900 on an initial outlay of about $54,970.  Nabulsi's total profit from his one-day trades in Life Technologies options and CFDs in his FFA Private Bank accounts was approximately $254,000, on an initial outlay of about $66,000.

74.     Nabulsi also liquidated the trades he made in a third party's account at FFA Private Bank for a profit of about $130,512 on the options, and about $27,270 on the CFDs.  The total profit was over $157,000, on an initial outlay of about $34,000.

75.     The Defendants' profits on their one-day positions in Life Technologies call options was over $877,000 in all known FFA Private Bank accounts, and the profits on their leveraged CFDs positions totaled about $144,000.  Thus, the Defendants' one-day profit on their

Life Technologies trading (for all known accounts) was over $1 million, after having made an initial outlay of about $258,000.

**6.    The Highly Suspicious Nature of Defendants' Trading on January 17**

76.    The positions in Life Technologies securities that the Defendants acquired right before the markets closed on January 17 were substantial.  In total, Jafar controlled or otherwise had an interest in, through the call options and CFDs he acquired on margin on January 17, approximately 105,000 shares of Life Technologies.  These shares had an underlying value of over $5.7 million, based on the January 17th closing stock price of $54.97 per share.

77.    Including the securities he acquired by power of attorney, Nabulsi controlled or otherwise had an interest, though options and CFDs, approximately 65,000 shares of Life Technologies stock.  These shares had an underlying value at the closing price of $54.97 of over $3.5 million.

78.    The Defendants' positions in Life Technologies securities were highly leveraged and risky.  For example, they purchased 1,000 January 55 call options for about $32,475.  This represented a position on 100,000 shares of Life Technologies, which at its closing price of $54.97 on January 17 represented shares worth $5,497,000.  Jafar and Nabulsi stood to make a substantial return if the stock price increased beyond the strike price and the premiums they paid for the options.

79.    But these options were set to expire the very next day, and so were very risky. Jafar and Nabulsi could have lost their entire $32,475 investment in all accounts in one day if the stock price stayed below the $55 strike price.  Buying these options amounted to betting $32,475 that the price would go up in a single day.

80.    The timing of the Defendants' trading in Life Technologies securities is also highly suspicious.  In total, Defendants purchased 1,000 January 55 options contracts between

approximately 3:28 p.m. and 3:32 p.m. EST on January 17, within roughly a half an hour of

market close at 4:00 p.m. EST.  They were the first purchasers of January 55 call options on that

day.   All of the subsequent trades were at premiums higher than those paid by Jafar, who made

the first purchase.  Indeed, Nabulsi's purchases in various accounts were filled at $0.34.

81.     All of the volume of trading in this series of options in the late afternoon of

January 17, just minutes before the market closed, followed Jafar's and Nabulsi's trades.  The

total volume of trading in the January 55 Life Technologies call options on January 17 was

2,792, and all of that volume followed Jafar's order for 500 contracts and Nabulsi's orders for

500 contracts, and occurred during the last half hour of trading before market close.  Defendants'

purchases of 1,000 January 55 Life Technologies call options represented over 35% of the total

volume reported on Bloomberg of that series of options traded that day.

82.     Defendants' accompanying purchases, on margin, of 25,000 CFDs in all accounts

on Life Technologies on January 17 adds to the highly suspicious nature of Defendants' trading

that day. These CFD positions were large and highly leveraged.  The cost of the underlying

contracts was in excess of $1.3 million, but because they were purchased on margin, the

Defendants only put up approximately $137,000 for these CFDs.  The CFDs could generate huge

returns if Life Technologies' stock price increased, but Jafar and Nabulsi (and the third party)

stood to lose substantial sums and could have been subjected to margin calls if the stock price

went down.

83.     The Defendants' purchases of Life Technologies call options on January 17 is

also highly suspicious because they made these purchases within the last hour of trading, and

only hours before the release of an article by the *Financial Post* that reported confidential

information of Life Technologies.  The information reported in the article was clearly obtained

from someone who had breached a fiduciary duty or who had misappropriated the information

from an individual who had breached such a duty.  Indeed, the article expressly referred to deal

documents that were shown to the newspaper, and all of these documents were supposed to be

protected from disclosure by confidentiality agreements.

84.     Upon information and belief, in advance of their trading on January 17,

Defendants were tipped confidential information about Life Technologies, Thermo Fisher, and

Project Liberty, by an individual or individuals who were subject to a confidentiality agreement

in breach of a fiduciary duty of trust and confidence, and/or were provided with information that

was misappropriated from such an individual in violation of a fiduciary duty to that insider.

**7.     FFA Private Bank's Inquiry into Defendant's Suspicious January 17 Trading**

85.     Shortly after their trading in Life Technologies securities on January 17, the

Defendants' own broker, FFA Private Bank, raised suspicions and inquired about their January

17 purchases.

86.     On January 31, 2013, FFA Private Bank sent an email to Jafar about his January

17, 2013 trades in January 55 and February 55 call options on Life Technologies.  The email

identified the specific trades and stated the reason for the inquiry:  "The following day, the

underlying stock opened sharply higher following a Press Release from the company, which

press release was apparently not pre-announced."  FFA Private Bank also asked six questions

about the trades.

87.     On January 31, 2013, Jafar responded by email with both a general narrative

statement and specific answers to the questions.  In that written response, Jafar denied having

access to any nonpublic information.  Instead, he claimed his investment "follows simular [*sic*]

reasons and risk exposure that I follow on my very active trading strategy."

88.     On February 6, 2013, FFA Private Bank also sent an email to Nabulsi about his January 17, 2013 trades in January 55 call options of Life Technologies in his own account, as well as in the account of the third party.  The email noted that Nabulsi had placed trades in his account and on behalf of a third party, and stated:  "The following day, the underlying stock opened sharply higher following a Press Release from the company, which press release was apparently not pre-announced."  FFA Private Bank asked Nabulsi to provide the rationale for his trades, and specifically to respond to the same six questions it had previously asked of Jafar.

89.     On February 7, 2013, Nabulsi responded in an email.  Nabulsi did not respond to the individual questions, and only provided a narrative.  Like Jafar, Nabulsi did not indicate that he traded on nonpublic information and instead claimed that his trading on January 17 was just a "modest bet" and that "taking a bet of around US$10,000 buying options on Life fits within my strategy."  Nabulsi's exposure on his one-day purchases of securities in Life Technologies was about $562,000, which greatly exceeded his claimed "modest bet" of $10,000.

90.     Nabulsi also explained that, "[f]or this specific trade, I have followed the analysis of a friend of mine Dhia Jafar who also has an account with FFA."

**B.     Defendants' Insider Trading in Onyx in June 2013**

91.     Jafar's and Nabulsi's trading in Onyx in June 2013 mirrored that of their trading in Life Technologies.  Just as they had done in January, on June 26 and 28, 2013, Jafar and Nabulsi amassed large positions in short-term call options and CFDs on Onyx—all large, risky bets that the stock price would increase in a very short amount of time.  Also, like their Life Technologies trading, they acquired these speculative Onyx positions shortly before the *Financial Post* published a story that identified confidential, nonpublic information about Onyx.  And, as with Life Technologies, Jafar and Nabulsi made the majority of their purchases right before  the *Financial Post* article was published just after the market closed on Friday, June 28.

92.     In response to the article and a press release issued by Onyx over the weekend, the value of the Defendants' well-timed trades increased dramatically the next trading day, Monday, July 1.  As a result of these highly leveraged and risky short-term bets, the Defendants made over approximately $ 2.7 million.

### 1.     Amgen's Highly Confidential Offer to Acquire Onyx

93.     At various times from 2011 through around August 2012, senior representatives of Amgen discussed the potential for a possible acquisition of Onyx by Amgen with representatives of Amgen's investment banker, Lazard Freres & Co. LLC ("Lazard") and with the CEO of Onyx.  All of these discussions were highly confidential.

94.     Over this period of time, representatives of Lazard met occasionally with the CEO of Onyx.  During these meetings, the Lazard representatives mentioned that Lazard was close to Amgen and that Onyx should keep Amgen in mind if Onyx was ever interested in pursuing a transaction.  Discussions between Amgen and Lazard regarding Onyx ultimately ceased around August 2012 without ever resulting in any serious discussions with Onyx.

95.     In late March 2013, representatives of Amgen and Lazard again began discussing the prospect of Amgen acquiring Onyx.

96.     The proposed acquisition was given the internal code name of "Project Nike" by Amgen to preserve its confidentiality and to provide additional assurances that conversations regarding the project, if overheard, and documents pertaining to the project, if seen, would not disclose the nature of the project or the identity of the target company.  Amgen employees on the Project Nike team were specifically instructed in meetings where the project was discussed of the need to keep it confidential, and the project was not discussed in broader group meetings with Amgen individuals who were not part of the Project Nike team.

97.    On May 22, 2013, Amgen's senior management discussed with Amgen's board of directors the possibility of acquiring Onyx.  In advance of that meeting, confidential pre-reading materials about Onyx were provided to the Amgen's directors on May 14, 2013.

98.    On May 23, 2013, representatives of Amgen contacted Bank of America Merrill Lynch to discuss financing alternatives, pursuant to standard confidentiality terms.

99.    On May 24, 2013, Amgen sent each identified staff member who had been (or was to be) provided confidential information relating to Project Nike a "Notice of Confidentiality Requirements for Project Nike."  The purpose of the notice was to inform team members that all information pertaining to Project Nike was restricted information, only authorized persons identified in the Confidentiality Notice (or who were subsequently added) may receive confidential information pertaining to Project Nike, and that team members had to receive approval from a senior officer of Amgen before disclosing information or discussing the project with any person not on the authorized persons list.

100.    On June 6, 2013, the Amgen legal department implemented an unscheduled blackout period with respect to trading in Amgen securities for members of Amgen's board of directors, members of Amgen's senior management, and all Project Nike team members.

101.    Also on June 6, Amgen's CEO contacted Onyx's CEO via telephone and requested a confidential in-person meeting.  Amgen's CEO did not discuss the purpose of the meeting and there were no further substantive discussions between June 6 and June 13, 2013.

102.    On June 13, 2013, Amgen sent each staff member on the authorized persons list for Project Nike another "Notice of Confidentiality for Project Nike," which reiterated the information in the prior notice.  The company also imposed Amgen's trading pre-clearance

procedures on the Project Nike team members not already subject to such requirements prior to their executing trades in Amgen securities.

103.     On June 13, 2013, Amgen's CEO met with Onyx's CEO in San Francisco to express Amgen's interest in a potential transaction, and indicated that Amgen may be willing to acquire Onyx for approximately $10 billion in cash.

104.     Later that day, certain members of Onyx's executive team were informed of the confidential offer from Amgen.  In addition, Onyx's CEO notified its investment banker, Centerview Partners LLC ("Centerview") of the unsolicited offer.  Centerview had a long term relationship with Onyx, Onyx stock had been on its restricted list since July 15, 2009, and Centerview had policies and procedures to ensure the confidentiality of nonpublic information.

105.     To protect the confidential information related to Amgen's proposed transaction, Onyx used a code name, "Project Titan," to refer to the potential transaction with its employees and advisors.  In addition, Onyx employees were required to sign an "Employee Confidential Information and Inventions Agreement" when they were hired requiring them to "hold in confidence and … not disclose, use …or publish any of the Company's Confidential Information."  Onyx further has both a Code of Conduct covering insider trading and confidentiality, and special trading procedures for insiders.

106.     On June 14, 2013, Amgen's CEO sent a confidential letter to Onyx's CEO outlining Amgen's proposal for an acquisition of Onyx at a price of $120 per share in cash, subject to various conditions stated in the letter.  Amgen's written proposal was also forwarded to the members of the Onyx board of directors on June 14.

107.     During the period from June 13 to June 26, 2013, a small group of Onyx executives, Centerview, and Onyx's outside counsel discussed Amgen's offer and Onyx's other

potential strategic alternatives.  These discussions were confidential and attendance was limited to a small group on a need-to-know basis.

108.    During the period from June 3, when Amgen's CEO first contacted Onyx's CEO to request a meeting, through June 30, 2013, no other companies expressed an interest in a potential business combination with Onyx.

109.    On June 26, Amgen's CEO sent a private text message to Onyx's CEO inquiring about Onyx's reaction to Amgen's proposal.  Onyx's CEO did not reply.

110.    On Wednesday, June 26, 2013, Onyx's board of directors convened a confidential in-person meeting to consider Amgen's offer.  At that meeting, the Onyx board decided to reject the offer because it determined it was not in the best interest of the company's shareholders.  The board also discussed the parameters for a potential sale process going forward and the possibility that Amgen might make its offer public (such as a hostile tender offer).  In addition, the board authorized Centerview to begin contacting selected third parties to gauge their interest in a potential strategic transaction.

111.    On Friday, June 28, 2013, Onyx's CEO informed Amgen's CEO that Onyx was rejecting Amgen's offer.

112.    Amgen's $120 per share offer represented about a 38% premium over Onyx's closing price of $86.82 per share on June 28, when Onyx rejected the offer.

### 2.    The Defendants' Purchase of Onyx Call Options and CFDs on June 26 and 28, 2013

113.    On Wednesday June 26, 2013 (when the Onyx board privately met and decided to reject Amgen's confidential offer), and then on Friday, June 28 (when Onyx notified Amgen of the rejection), Nabulsi and Jafar amassed large, risky positions in short-term call options and leveraged CFDs for Onyx.

       a.      **Jafar's Trading on June 26 and 28, 2013**

114.    On Wednesday June 26, Jafar purchased 80 July 80 call options on Onyx.  These July 80 call options had an expiration date of Friday, July 19, and gave Jafar the right to buy 8,000 shares of Onyx at a strike price of $80 per share.  He paid a premium of $5.90 for these options, for a total cost of $47,440.

115.    Jafar was the only purchaser of the July 80 series of Onyx call options on June 26. His purchase thus represented 100% of the volume of trading reported on Bloomberg in that series on that day.

116.    Also on June 26, at approximately 12:23 p.m. EST, Jafar purchased 150 July 85 call options on Onyx at a premium of $2.95, for a total cost of $44,700.  The July 85 call options were set to expire Friday, July 19, and gave Jafar the right to buy 15,000 shares of Onyx at a strike price of $85 per share.

117.    Before Jafar's order, only 26 contracts in the July 85 call option series had traded on June 26.  Jafar's order for 150 contracts was almost five times the volume that had traded before his order hit the market.

118.    Later that same day, at approximately 12:42 p.m. EST, Jafar purchased another 25 July 85 options at a premium of $3.10, for a total cost of $7,825.  These options gave him the right to buy 2,500 shares of Onyx stock at $85.00 per share.

119.    By the time Jafar finished purchasing all of his July 85 call options on June 26, at around 12:42 p.m. EST, only about 225 contracts had traded in that series.  Thus, Jafar's purchases of 175 July 85 call options represented 78% of the volume reported on Bloomberg up to that point that day.  His purchase of 175 options ultimately accounted for approximately 42% of all of the volume traded in that option series that whole day.

120.     Jafar's purchase of Onyx call options on June 26 were bets that Onyx stock would go up.  Onyx stock closed at $84.17 per share on June 26.  For the July 80 calls, Jafar stood to lose his entire investment if the price dropped below $80 per share in the following three weeks, and could only make a profit by exercising the options if the price increased to more than $85.90 per share.

121.     The July 85 call options he bought on June 26 were out of the money.  For these options, Jafar could only profit by exercising the options if the stock price increased to more than $87.95 per share (for his first lot of 150 contracts) and $88.10 per share (for his second lot of 25 contacts).  And he would have lost his entire investment of $52,525 if the price continued to trade below $85 per share, as it did when the stock closed on June 26.

122.     Defendants did not make any purchases of Onyx options in any known accounts at FFA Private Bank on Thursday, June 27, 2013.  There were also no trades executed on June 27 in July 80 call options of Onyx.

123.     But on Friday, June 28, 2013, Jafar doubled down on his aggressive bets.  First, he purchased 20 more July 80 Onyx call options at an even higher premium of $7.10, for a total of $14,260, and purchased 35 more July 85 Onyx calls at an increased premium of $4.00, for a total of $14,105.  These options gave him the right to buy 2,000 shares at $80 per share, and 3,500 shares at $85 per share, respectively.

124.     The closing price for Onyx stock on June 28 was $86.82 per share.  With the July 80 calls he acquired on June 28, Jafar would only profit if the stock price exceeded $87.10 per share before expiration, and with the July 85 calls purchased that day, he would only earn a profit by exercising the options if the stock price rose to more than $89 per share before the

options expired.  But he would lose his entire investment of about $28,365 in these options if the stock price dropped below the respective strike prices for each series.

125.     Only 30 July 80 call option contracts were traded on June 28.  Jafar's purchase of 20 contracts in this series represented 66% of all of the volume reported on Bloomberg in that series of options that day.  Moreover, the other 10 contracts were acquired by just one person, and that individual resides in the UAE, which is where Jafar and Nabulsi reside.

126.     In addition to increasing his position in the July 80 and July 85 calls, Jafar purchased 270 July 92.5 Onyx call options on June 28.  The July 92.5 call options had an expiration date of Friday, July 19, and gave Jafar the right to buy 27,000 Onyx shares at a strike price of $92.50 per share.   He purchased these options in five lots:  (1) 100 contracts at a premium of $1.50 for $15,300; (2) 50 contracts at a premium of $1.60 for $8,150; (3) 20 contracts at a premium of $1.69 for $3,440; (4) 50 contracts at a premium of $1.70 for $8,650, and (5) 50 contracts at a premium of $1.75 for $8,900.  In total, Jafar paid about $44,440 for these options.

127.     Jafar's purchase of 270 July 92.5 call options represented over 56% of all of the volume reported on Bloomberg in that series of options that day.

128.     The July 92.5 call options were out-of-the-money options.  Onyx stock closed at $86.82 per share on June 28.  To reach the $92.50 strike price, Onyx stock needed to increase in value over 6.5% in three weeks.  In addition, for Jafar to profit on an exercise of the option, Onyx's stock price needed to increase to more than about $94 per share, or the total of the strike price and the premium Jafar paid.  To do so, the price would have to increase by more than 8.2% in just three weeks.

129.   In total, Jafar spent approximately $172,770 on June 26 and June 28 purchasing call options on 58,000 shares of Onyx stock.

b.   **Nabulsi's Trading on June 28, 2013**

130.   On Friday, June 28, Nabulsi purchased Onyx call options and CFDs on margin.

131.   On that day, Nabulsi purchased 50 July 90 Onyx call options at a price of $2.45 per contract, for a total cost of $12,400.  These options gave Nabulsi the right to buy 5,000 shares of Onyx stock at $90 per share.

132.   Nabulsi's purchase of the July 90 call options represented 16% of all volume reported on Bloomberg in that series that day.

133.   The July 90 Onyx call options were out-of-the-money options.  For Nabulsi to make money on an exercise of these options, Onyx's stock price needed to increase to more than $92.45 per share, or more than 6.4% from the June 28th closing price.

134.   Also on June 28, Nabulsi purchased 5,000 CFDs on Onyx at a price of $87.56. The total cost of the purchase was $437,801.

135.   Nabulsi purchased these CFDs in his margin account, which was debited $43,415 for opening the position.  By taking this large position in Onyx CFDs on margin, Nabulsi was betting that Onyx's stock price would increase.  The CFDs were a leveraged position, and exposed Nabulsi to potential significant losses beyond his margin investment of $43,415 if the value of the underlying Onyx stock fell.

3.   **The Release of Confidential Information about Onyx and Amgen after the Close of the Market on June 28**

136.   After the market closed on June 28, 2013, at approximately 5:43 p.m. EST, the *Financial Post* posted an article headlined "Amgen circles Onyx Pharmaceuticals with eye to a deal at US$120 a share."  The article was written by Barry Critchley.

31

137.    The *Financial Post* article referred to "documents" it had seen as the basis for its article, and specifically appears to quote from the confidential letter dated June 14, 2013 sent by Amgen to Onyx.

138.    The *Financial Post* article reported:  "'I feel a timely combination or our organization would be very complementary,' said a letter written by Amgen to Onyx two weeks back, one day after a meeting between senior executives of the two companies.  The article reported further:  "In the material sent to Onyx, Amgen said that it 'would propose an acquisition of Onyx by Amgen for US$120 in cash for each share of Onyx.'  At US$120 a share, the proposed price represented a 34% premium to Onyx's closing share price."

139.    The *Financial Post* further reported:  "Sources have indicated that if and when the matter of Amgen's potential interest in Onyx emerges, then a slew of other potential buyers would enter the fray.  The reason:  Onyx is now in play and hence represents a possible acquisition target."

140.    The article also reported:  "If Amgen, or any other life sciences company, does indeed acquire Onyx, then it will be at least the second mega deal in the sector this year.  Earlier, Thermo Fisher Scientific acquired Life Technologies Corp. for US$13.6 billion."

141.    Finally, the *Financial Post* reported that Onyx and Amgen had responded to messages seeking a comment:  "Amgen said 'we don't provide comment on market rumour and speculation' while Onyx said 'it doesn't comment on rumours and speculation."

142.    After the publication of the *Financial Post* article, Onyx stock price increased 17% in afterhours trading on June 28.

    **4.**      **Onyx's and Amgen's Reaction to the Surprise Disclosure of their Confidential Information**

143.    Both Amgen and Onyx were surprised at news of the leak of their confidential information.  Amgen and Onyx considered Amgen's solicitation of Onyx, and the conversations surrounding the June 13 offer, to be highly confidential and sensitive communications.

144.    Onyx's CEO learned about the *Financial Post* article on Friday, June 28, 2013 shortly after it was posted online.

145.    On Saturday, June 29, 2013, at 10:00 a.m. PST, and then on Sunday, June 30 at 8:00 a.m. PST, Onyx's executive team had confidential discussions about the *Financial Post* story, and how to respond.  Onyx convened a meeting of its board of directors on Sunday, June 30, to discuss how best to address the matter.

146.    Meanwhile, on June 28, Amgen learned about the *Financial Post* article from its investment bankers that evening, and asked them to contact Onyx's investment bankers early the next week.

147.    Later on Sunday, June 30, 2013, Onyx issued a statement titled "Board of Directors Rejects $120 per Share Proposal as Significantly Undervaluing Company."  In the press release, Onyx confirmed that it had received an offer from Amgen at $120 per share, and that after Onyx's Board determined that the offer was "not in the best interest of Onyx or its shareholders," then "Onyx communicated this determination to Amgen on Friday, June 28, 2013."

148.    The release stated further:  "Onyx does not intend to communicate further regarding the Amgen proposal or the process by which the Board of Directors will consider other proposals.  There can be no assurance that an improved proposal will be made by Amgen or any

33

other entity, that a definitive agreement will be executed relating to any proposed transaction, or that any transaction will be approved or consummated."

  **5. The Defendants' Substantial Profits after Onyx's Stock Skyrockets on Monday, July 1, 2013**

  149. After Onyx's weekend press release, Onyx's share price skyrocketed on Monday, July 1.  Onyx stock increased from its closing price of $86.82 on Friday, June 28, to close at $131.33 on Monday, July 1.  This was an increase of over 51%.  There was also a dramatic rise in Onyx's trading volume by over 900% from June 28 to July 1.

  150. On July 1, 2013, the Defendants liquidated the Onyx investments they had made on June 26 and June 28.

  151. Jafar sold his 100 July 80 call options at a price of $51.226, for proceeds of about $511,960.

  152. Jafar sold 20 of his July 85 call options at a price of $45.95, for proceeds of about $91,840.

  153. Jafar sold 100 of his July 85 call options at a price of $46.05, for proceeds of about $460,200.

  154. Jafar sold 90 of his July 85 call options at a price of $46.10, for proceeds of about $414,630.

  155. Jafar sold 20 of his July 92.5 call options at a price of $38.30, for proceeds of about $76,540.

  156. Jafar sold 50 of his July 92.5 call options at a price of $38.40, for proceeds of about $191,850.

  157. Jafar exercised 200 of his July 92.5 call options, at a cost of $1,856,475, to purchase 20,000 shares of Onyx at $92.5 per share.  Jafar then sold 5,000 of those shares at $132

per share for proceeds of about $657,690; sold another 5,000 shares at $131 per share for proceeds of about $652,707.50; and sold 10,000 of those shares at $130.775 per share for proceeds of about $1,303,172.

158.    Jafar's profit from the Onyx options he purchased on June 26 and 28 for about $172,770, and sold on July 1, was approximately $2,331,345.

159.    On July 1, Nabulsi sold his 50 July 90 calls, which he had purchased for about 12,400, at a price of $41.7.  His proceeds were about $208,350.

160.    Nabulsi also sold his CFDs on July 1 at a price of $131.4 per contract, for proceeds of about $657,000.  Nabulsi's FFA Private Bank statement states he made a one-day profit of $222,850 on his margin purchase of Onyx CFDs.

161.    Nabulsi's profit from his trading in Onyx options and CFDs purchased on Friday, June 28, and sold on July 1, was approximately $418,800.

162.    Defendants' combined profits on their Onyx trades on June 26 and June 28 was about $2,750,145, in all known accounts at FFA Private Bank, on an initial total outlay of about $228,585.

### 6.    The Highly Suspicious Nature of Defendants' Trading on June 26 and 28

163.    Defendants' purchases of Onyx securities in June 2013 are highly suspicious since they followed the same pattern as their trading in Life Technologies securities in January.

164.    Their Onyx call options positions were substantial and highly leveraged.  Over the course of two trading days, Jafar amassed a total of 580 option contracts.  Jafar had paid $172,770 for these contracts, which represented 58,000 shares of Onyx, worth approximately $5,035,560 at the June 28 closing price of $86.82.

165.    On June 28, Nabulsi purchased 50 call options at a cost of $12,400; these options represented interests in 5,000 shares worth about $434,100 at the closing price that day.  As for

the 5,000 CFDs he purchased on margin, the total cost at the time of purchase of those contracts was $437,801.  Thus, he had made an initial outlay of about $55,815 for interests in 10,000 shares of Onyx stock that had an underlying value of about $868,200, based on the closing price that day.

166.     In total, Defendants' positions represented 68,000 shares of Onyx, which had a total value of approximately $5.9 million at the closing price of $86.82 on June 28, 2013.

167.     Like their positions in Life Technologies in January, the Defendants' positions in the Onyx securities they acquired in June 2013 were risky.  For instance, each purchased large positions in out-of-the-money options—Jafar acquired July 92.5 options and Nabulsi purchased July 90 options.  Onyx's stock price had to increase for the Defendants to profit from these options.  Indeed, the price for the July 92.5 and July 90 options had to go up about 8.2% and 6.4% in just three weeks, respectively, to be profitable.  But if the price of Onyx decreased, or even remained at or around the closing price when these out-of-the-money options were purchased, Jafar and Nabulsi would have lost their entire combined investment of about $56,840 in just a matter of weeks.

168.     Moreover, the Defendants' purchases accounted for most, and sometimes all of the trading volume of the options series they bought, and because their purchases were so large, they impacted the market for the options.  For example, on June 26, only about 26 contracts for July 85 Onyx call options had traded before Jafar placed his aggressive order for 150 contracts.  After Jafar placed that large order, the weighted average price for the July 85 contracts increased from $2.69 to $2.95, or over a 9% increase.  The volume of trading in this options series also increased after Jafar's purchase.  By the time Jafar finished buying his position in July 85 options

around mid-day on June 26, his purchases accounted for about 78% of the trading; by the end of the day, his purchases accounted for about 42% of the volume of all trading that day.

169.     Also, Jafar's purchase of 80 July 80 Onyx call options on June 26 exceeded the "open interest" of 50 contracts in that series of option of that day.  Options only come into existence when someone wants to trade them.  Every morning, the public is given an updated report of how many options contracts of a particular series are in existence, or "open," which is called the "open interest."  Jafar's purchase of 80 contracts almost doubled the "open interest" of 50 contracts in that series of options that day.  He was also the only purchaser of July 80 Onyx call options on June 26.  So, the open interest increased to 130 contracts the following day, as 80 new contracts were opened to satisfy his demand.

170.     On June 28, Jafar's purchase of 20 July 80 Onyx call options represented two-thirds of all of the volume in that series of options traded that day.  The remaining 10 July 80 contracts traded that day were purchased by an individual who also resides in the United Arab Emirates.

171.     On June 28, Jafar's purchase of 270 July 92.5 Onyx call options represented over 56% of all volume in that series of options that day.

172.     Defendants' purchases of Onyx securities are also highly suspicious because they were made on the days when the Onyx board of directors decided to reject Amgen's confidential $120-per-share offer to buy Onyx (June 26) and when Onyx communicated its rejection of that offer as not being in the best interest of the company's shareholders (June 28).  Their trading also occurred right before the *Financial Post* posted its article online after the markets closed on June 28, reporting the confidential information about Onyx and Amgen.  The information reported in the article was clearly obtained from someone who had breached a fiduciary duty or who had

misappropriated the information from an individual who had breached such a duty.  Indeed, the *Financial Post* article quotes from the confidential letter sent by Amgen to Onyx.

173.    Upon information and belief, in advance of their trading on June 26 and 28, 2013, Defendants were tipped confidential information about Onyx, Amgen, Project Nike and Project Titan by an individual or individuals who were subject to a confidentiality agreement in breach of a fiduciary duty of trust and confidence, and/or were provided with information that was misappropriated from such an individual in violation of a fiduciary duty to that insider.

174.    In short, the Defendants' pattern of amassing highly leveraged, short-term positions immediately prior to the release of confidential information that had been misappropriated from the companies in which they invested, and which plainly was market-moving information, is highly suspicious.  In both Life Technologies and Onyx, Defendants were the market leaders, in terms of timing and volume, with their purchases.  In conjunction with the timing immediately before the *Financial Post* articles revealed confidential information on the company in which they had amassed a large position, the timing and volume of Defendants' trading is highly suspicious.

**7.    FFA Private Bank's Inquiry into the Defendants' Suspicious Trading in Onyx Call Options**

175.    Again, the Defendants' trading raised the suspicions of their own brokers.  They very same day they liquidated their positions on July 1, FFA Private Bank inquired about their Onyx call option and CFD positions.

176.    On July 1, 2013, Defendants' broker FFA Private Bank sent emails to each of the Defendants asking for information about their trades in Onyx options "one day before an announcement by the Company relating to an offer to purchase."

177.    On July 3, 2013, Jafar emailed his response to FFA Private Bank's inquiry.  He did not state that he had traded on nonpublic information.  Instead he referred to his "style of trading," claiming "I've long been playing Biotechs, namely large caps with an M&A theme, trying to identify swing points or breakouts while utilizing options for leverage and risk control."

178.    In addition, Jafar stated:  "I generally avoid outright leverage instruments (CFDs) on biotech stocks for the fear of regulatory surprises and drug safety issues that can suddenly wipe big chunks out of the market cap."  As alleged above, Jafar had invested in CFDs for Life Technologies, which is a biotech company.

179.    On July 7, 2013, Nabulsi provided his written response to the inquiry.  He claimed "My investment philosophy can be characterized as very speculative by investing in CFD's and/or options in relatively volatile sectors with relatively short holding periods."  In addition, Nabulsi stated that "taking a bet of around US$12,250 buying options on Onyx Pharmaceuticals fits within my strategy," and that "[t]he story started when I was watching Jim Cramer Mad Money show on CNBC."

180.    Nabulsi also claimed his "average bet size can range from US$10,000 – US$100,000 per transaction."  Nabulsi's exposure on his June 28th purchases of Onyx securities was about $450,000, which greatly exceeded his claimed "average bet" of $10,000 to $100,000.

181.    On July 3, 2013, FFA Private Bank reported the suspicious trading to Lebanon and Dubai regulators.  On or about July 4, these foreign regulators issued an order blocking the accounts of the Defendants, which included rejecting any instructions from the clients to carry out any transactions in the accounts.

## CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
(Against All Defendants)**

182.    The SEC realleges and incorporates by reference paragraphs 1 through 181, as though fully set forth herein.

183.    Upon information and belief, at the time the Defendants purchased short-term call options on Life Technologies stock on January 17, 2013, as alleged above, they were in possession of material, nonpublic information about Life Technologies, Thermo Fisher, Project Liberty and Life Technologies' confidential strategic discussions.  Defendants:  (a) knew, recklessly disregarded, or should have known that their trading was in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, owed to the shareholders of Life Technologies and Thermo Fisher, or to the source from whom they received the material, nonpublic information; and/or (b) knew, recklessly disregarded, or should have known, that the material, nonpublic information about the contemplated acquisition that had been conveyed to them was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

184.    Upon information and belief, any and all material, nonpublic information that the Defendants received concerning Life Technologies, Thermo Fisher, Project Liberty and Life Technologies' confidential  strategic discussions, as set forth above, was disclosed to them by a person or persons who tipped such information with the expectation of receiving a benefit.

185.    Upon information and belief, at the time the Defendants purchased short-term call options on Onyx stock on June 26 and 28, 2013, as alleged above, they were in possession of material, nonpublic information about Onyx, Amgen, Project Nike, Project Titan and Onyx's confidential strategic discussions.  Defendants:  (a) knew, recklessly disregarded, or should have

known that their trading was in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, owed to the shareholders of Onyx and Amgen, or to the source from whom they received the material, nonpublic information; and/or (b) knew, recklessly disregarded, or should have known, that the material, nonpublic information about the contemplated acquisition that had been conveyed to them was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

186.    Upon information and belief, any and all material, nonpublic information that the Defendants received concerning Onyx, Amgen, Project Nike, Project Titan and Onyx's confidential  strategic discussions, as set forth above, was disclosed to them by a person or persons who tipped such information with the expectation of receiving a benefit.

187.    By virtue of the foregoing, the Defendants, singly or in concert with others, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

188.    By virtue of the foregoing, the Defendants, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## **RELIEF SOUGHT**

WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Ordering Defendants to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the conduct alleged in this Complaint.

### III.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act, 15 U.S.C. §§ 78u(d)(3), 78u-1.

### IV.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       December 20, 2013

John W. Berry (JB-8725) (berryj@sec.gov)
John B. Bulgozdy (admitted *pro hac vice*)
Sam S. Puathasnanon (admitted *pro hac vice*)
Melissia A. Buckhalter-Honore (admitted *pro hac vice*)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
5670 Wilshire Blvd., Suite 1100
Los Angeles, California 90036
(323) 965-3998

<u>Local Counsel</u>
Alexander M. Vasilescu (vasilescua@sec.gov)
Regional Trial Counsel
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0181