UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
 SECURITIES AND EXCHANGE                                     :
 COMMISSION,                                                 :
                                        Plaintiff,           :            13-CV-4645 (JPO)
                                                             :
                   -v-                                       :       OPINION AND ORDER
                                                             :
 ONE OR MORE UNKNOWN TRADERS IN                              :
 THE SECURITIES OF ONYX                                      :
 PHARMACEUTICALS, INC.,                                      :
                                        Defendants.          :
                                                             :
-------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

        The Securities and Exchange Commission brought this action against unknown traders

who purchased call options for shares of Onyx Pharmaceuticals, Inc. shortly before Onyx made a

public announcement causing its shares to jump 51% in value.  The SEC alleges that these

purchases were insider trades in violation of section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5.  After the Court dismissed the

original complaint for failure to state a claim, the SEC filed an amended complaint naming Omar

Nabulsi and Dhia Jafar as Defendants.  The Court has frozen all assets related to the Onyx trades

in question pending review of the amended complaint.  Jafar and Nabulsi have moved to vacate

the order freezing their assets and to dismiss the amended complaint for failure to state a claim,

or, in the alternative, to modify the order freezing their assets.  For the reasons that follow, their

motion is denied.

I.      **Background**

The Court's opinion granting the first motion to dismiss, 296 F.R.D. 241 (S.D.N.Y. 2013)

(Dkt. No. 42), summarizes the facts alleged in the original complaint.  The amended complaint

reiterates these facts, along with new allegations about the circumstances of the Onyx trades, as

well as allegations that Jafar and Nabulsi are liable for insider trading in shares of another

biotechnology company, Life Technologies Corp.  The new allegations are summarized below.

A.      **Onyx Trades**

Amgen, Inc. began discussing the possibility of purchasing Onyx in March 2013.  The

potential offer was code-named "Project Nike," and all Amgen employees familiar with the

project were required to sign a confidentiality agreement.  When Amgen finally made its offer,

Onyx, too, required all employees familiar with the offer to sign a confidentiality agreement.

The small group of Onyx executives working on the Amgen offer referred to the offer as "Project

Titan."

Onyx's board of directors did not meet to discuss the proposal until June 26, 2013, when

Amgen's CEO sent a private message to Onyx's CEO asking for a reply.  Onyx's board

ultimately rejected the proposal.  That same day, Jafar began purchasing Onyx securities.  Two

days later, Onyx's CEO told Amgen's CEO about the rejection—and both Jafar and Nabulsi

bought more Onyx securities.  A few hours later, shortly after the market closed, a reporter

named Barry Critchley published an article about Amgen's offer in the Financial Post.

Jafar and Nabulsi's trades were unusual.  Jafar was the only person to purchase July 80

call options on June 26.  And when Jafar placed his two orders for July 85 call options, his

purchase accounted for 78% of the trading volume so far that day.  His first order was so

significant that it "moved the market"; he had to pay a higher premium on his second order just

19 minutes later.  (Pl.'s Opp. at 13, Dkt. No. 62.)  By the end of the day, Jafar's orders of July 85

2

call options still constituted 42% of the day's trading volume in that series.  Many of the

Defendants' trades on June 28 were also outliers.  Nabulsi's purchase was 16% of the total

volume of July 90 call options purchased on June 28; he also bought 5,000 contracts for

difference (CFDs).  Jafar purchased call options in three different series; in two of the series, his

purchase was more than half of the total volume for the day.  He was one of only two people to

purchase July 80 call options on June 28.  Altogether, before the Critchley article was published,

Jafar had spent $172,770 on Onyx call options.  In response to inquiries from his bank following

the Onyx trades, Jafar stated that he typically avoids CFDs on biotechnology stock.  Nabulsi

stated that his average purchase was $10,000 to $100,000 per transaction.

B.     Life Technologies Trades

The amended complaint links Jafar and Nabulsi to another fortuitous series of trades in a

biotechnology company.  Life Technologies first considered the possibility of a leveraged buyout

in June 2012.  The board had already hired investment bank Moelis & Company in January

2011.  In anticipation of the potential buyout, the board also retained Cravath, Swain and Moore

as outside counsel and Deutsche Bank Securities, Inc. as an independent financial advisor.  The

board officially delegated authority to oversee the potential buyout to its Governance and

Nominating Committee, which nicknamed the plan "Project Liberty" to maintain the

confidentiality of the project.  The few employees who worked on Project Liberty were

prohibited from trading in Life stock between December 15, 2012 and February 7, 2013.  All

outside parties who knew of Project Liberty—employees of Moelis, Cravath, Deutsche Bank,

and any potential buyers—were required to sign a confidentiality agreement.

The G&N Committee began to contact potential buyers on December 4, 2012.  Beginning

January 1, 2013, buyers that signed the confidentiality agreement had access to a secure online

data room in which Life provided limited nonpublic information to facilitate the potential buyout.

Thermo Fisher Scientific, Inc. was a potential buyer.  About a dozen high-level executives at Thermo Fisher consulted with counsel about acquiring Life.  Their discussion was "highly confidential."  (Am. Compl. ¶ 26, Dkt. No. 45.)  On January 8, Thermo Fischer's CEO called Life's CEO and offered to buy 100% of Life's outstanding equity.  Thermo Fischer's CEO followed up the same day with a letter to Life's CEO labeled "Strictly Private & Confidential."  Five days later, Life's G&N committee had a confidential meeting with Deutsche Bank and Moelis to discuss Thermo Fischer's offer.  Three days after that, on January 16, Life's board of directors discussed the offer in a private conference call.  Only nine people were on the line: six directors, the CFO, the Chief Legal Officer, and a partner from Cravath.

Despite all the foregoing measures that both Life and Thermo Fischer took to keep their negotiations secret, some of the information leaked.  Shortly after the market closed on January 17, 2013, Barry Critchley—the same journalist who would later report on Amgen's offer to Onyx—published an article about Life's overtures to potential buyers.  The article reported that Life had retained Deutsche Bank and Moelis to facilitate a buyout, named four potential buyers by name, described the confidential online data room, and referred to "documents" and "confidentiality agreements" that had been exchanged between Life and the potential buyers.  The article claimed that Life could ultimately sell for $65 to $75 per share, which was more than $10 per share higher than the price at which Life was trading on January 17.  (*Id.* ¶ 53.)

Life's executives and directors were surprised by Critchley's article.  The board immediately convened a meeting to discuss how to handle the situation, and they decided to issue a press release before the market opened the next day.  Life executives met shortly thereafter to issue a brief statement acknowledging that the company had retained Deutsche

Bank and Moelis.  When the market opened the next morning, Life's shares jumped 11% in value.

Just three hours before Critchley published his article, Jafar and Nabulsi bought significant amounts of Life securities.  Together, they purchased 1,000 January 55 call options for $32,475—options that were almost $2 out of the money and set to expire the next day.  They were the first traders to purchase January 55 call options on January 17, and no one had bought January 55 call options the day before.  Although there was a sharp rise in trading volume after Jafar and Nabulsi bought their January 55 call options, by the time the market closed, their purchases still represented 35% of the total volume for the day.  The same afternoon, Jafar purchased 450[1] February 55 call options for $88,650, and both Jafar and Nabulsi purchased a combined total of 25,000 Life CFDs.  The CFDs were purchased on margin (partially on credit); together, Jafar and Nabulsi put up $137,425.  If the price of Life stock fell low enough to trigger a margin call, Jafar and Nabulsi would either completely lose the $137,425 they had already put up, or risk even more cash to keep their CFDs.

The day after Critchley published his article, Jafar and Nabulsi liquidated all of their options and CFDs.  Together, they profited over one million dollars in one day.  Their broker, FFA Private Bank, was suspicious, and asked them for an explanation.  Jafar and Nabulsi both claimed that their purchases were part of their normal trading strategy.

---

[1] Jafar initially purchased 500 February 55 call options, but he sold 50 the same afternoon.

## II.      Discussion

### A.      Sufficiency of the Complaint

#### 1.      Pleading Standard

As noted in the opinion on Defendants' first motion to dismiss, the pleading standard for an insider trading claim is not straightforward.  The Court must begin with the general pleading standard, Federal Rule of Civil Procedure 8, which requires a complaint to make a short, plain statement of a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To determine whether a complaint satisfies Rule 8, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  *Id.*  But the court need not accept "[t]hreadbare recitals of the elements of a cause of action," which are essentially legal conclusions.  *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).  After separating legal conclusions from well-pleaded factual allegations, the court must determine whether those facts make it plausible—not merely possible—that the defendants acted unlawfully.  *Id.*

Insider trading claims are also subject to Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) allows a party to allege a person's state of mind in general terms, but otherwise requires that circumstances constituting fraud be stated "with particularity."  This rule is intended to provide defendants with fair notice of the plaintiff's claim, to discourage plaintiffs from making a cavalier decision to accuse a defendant of fraud, and to protect defendants from strike suits.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F. 3d 87, 99 (2d Cir. 2007) (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.2004)).  Rule 9(b) is more demanding than Rule 8, but it does not replace Rule 8.  The rules must be read in conjunction with one another.  Wright & Miller, Fed. Prac. & Proc.: Civil 3d § 1298 (2004 & Supp. 2013); *see United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (applying *Iqbal*

to claims subject to Rule 9(b)); *In re Xethanol Corp. Secs. Litig.*, No. 06 Civ. 10234 (HB), 2007 WL 2572088, *2 (S.D.N.Y. Sept. 7, 2007) (applying *Twombly* and Rule 9(b) to claims under § 10(b) of the Exchange Act).

In most cases, pleading fraud with particularity requires the plaintiff to specify the person who made the misrepresentation, the time and place of the misrepresentation, the content of the misrepresentation, and the reasons the misrepresentation was fraudulent.  *See Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197–98 (2d Cir. 2013) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  But because insider tips are typically passed on in secret, it is often impractical to require plaintiffs to allege these details with particularity.  Instead, Rule 9(b) may be relaxed to allow a plaintiff to plead facts that imply the content and circumstances of an insider tip.  *SEC v. Aragon Capital Advisors, LLC*, No. 07 Civ. 0919 (FM), 2011 WL 3278907, at *10 (S.D.N.Y. July 26, 2011) (quoting *SEC v. Alexander*, 160 F. Supp. 2d 642, 649 (S.D.N.Y. 2001)); *see also In re Global Crossing, Ltd. Secs. Litig.*, No. 02 Civ. 0910 (GEL), 2005 WL 2990646, at *10 (S.D.N.Y. Nov. 7, 2005) (comparing approaches to Rule 9(b) in insider trading cases).  This relaxation should not completely eliminate the rigors of Rule 9(b).  Each of the cases in this Circuit relaxing Rule 9(b) ultimately relies on *Segal v. Gordon*, 467 F.2d 602 (2d Cir. 1972), which held that "[w]hile the rule is relaxed as to matters peculiarly within the adverse parties' knowledge, [] allegations [on information and belief] must then be accompanied by a statement of the facts upon which the belief is founded."  467 F.2d at 608 (citing 2A James Wm. Moore, Moore's Fed. Prac. ¶ 9.03, at 1928–29 (2d ed. 1968)).  Rule 9(b) is therefore relaxed only to the following extent: if a tip took place under circumstances known only to the defendant and the tipper, the plaintiff may plead a belief about the content and the circumstances of the tip, coupled with particular facts supporting that belief.

7

As opposed to other circumstances constituting fraud, states of mind may be pleaded "generally" under Rule 9(b).  This provision is not a "license to base claims of fraud on speculation and conclusory allegations."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).  Instead, a general allegation about the defendant's state of mind must be supported by specific facts that strongly support an inference[2] of fraudulent intent.  *Id.* (citing *Mills*, 12 F.3d at 1176).  The inference may be supported by the defendant's motive and opportunity to defraud, or by other facts showing that the defendant acted knowingly or recklessly.  *See id.* (citing *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268–69 (2d Cir. 1993)).  The Second Circuit has also held that a complaint subject to Rule 9(b) should be allowed to survive a motion to dismiss based on "fairly tenuous inferences" of intent, because intent is a fact that a jury should find.  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (citing *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).  Nevertheless, it appears that complaints under Rule 9(b) are simultaneously subject to the "strong inference" standard.  *See id.* (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

---

[2] The Second Circuit has applied the "strong inference" standard for pleading states of mind under Rule 9(b) since the 1970s.  *See Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir. 1979). Congress adopted this standard in the Private Securities Litigation Reform Act (PSLRA) in 1995. 15 U.S.C. § 78u-4(b)(2)(A).  The Supreme Court has interpreted "strong inference" as used in the PSLRA to have different meaning than "strong inference" as defined by the Second Circuit. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("While adopting the Second Circuit's 'strong inference' standard, Congress did not codify that Circuit's case law interpreting the standard.").  Because the PSLRA applies only to private securities litigation, the Supreme Court's interpretation of "strong inference" as used in the PSLRA does not apply to SEC enforcement actions.  *SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) ("[H]ad Congress wanted the PSLRA to restrain the SEC's ability to plead securities fraud, it could have said so easily.").  This opinion applies the Second Circuit's pre-PSLRA "strong inference" standard, not cases interpreting "strong inference" as used in the PSLRA.  For a thorough discussion of this issue, see *Dunn*, 587 F. Supp. 2d at 499–502.

In sum, to state an insider trading claim, the SEC must make particular factual allegations supporting a reasonable inference that the defendants violated Section 10(b) and Rule 10b–5.  If facts about the content or circumstances of an insider tip are known only to the defendant and the insider, the SEC may plead a belief about the tip coupled with particular facts supporting that belief.  The SEC's allegations must strongly support an inference that the defendant acted with intent to defraud.

### 2. Elements of an Insider Trading Claim Under Section 10(b) and Rule 10b–5

Section 10(b) of the Securities Exchange Act forbids the use of "any manipulative or deceptive device or contrivance in contravention of" rules adopted by the SEC, if such use is "in connection with" securities trading.  15 U.S.C. § 78j(b).  The SEC adopted Rule 10b–5 to prohibit, among other things, the use of an instrumentality of interstate commerce to "engage in any act . . . which operates . . . as a fraud or deceit upon any person" in connection with securities trading.  17 C.F.R. § 240.10b–5.  Insider trading violates these laws.  *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012) (citations omitted).  The Supreme Court has recognized two types of insider trading.  First, under the classical theory, a corporate insider trades shares of that corporation using material nonpublic information in violation of the duty of trust and confidence that corporate insiders owe to shareholders.  *Id.* (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  Second, under the misappropriation theory, a corporate insider shares material nonpublic information with a person who secretly misappropriates the information for personal gain in the securities market, in violation of a fiduciary duty[3] to the insider.  *Id.* at 284–85 (citing

---

[3] The key element to any misappropriation case is a fiduciary relationship, or a functional equivalent, between two parties.  *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) (Sotomayor, J.).  The SEC adopted Rule 10b5–2 to define three categories of cases giving rise to an actionable fiduciary duty.  17 C.F.R. § 240.10b5–2; *see SEC v. Conradt*, 947 F. Supp. 2d 406 (S.D.N.Y. 2013).

*United States v. O'Hagan*, 521 U.S. 642, 652 (1997); *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991) (*en banc*)).  Under both theories, the fiduciary duty of trust and confidence requires the person who knows material nonpublic information either to abstain from trading on the information or to make a disclosure before trading.  *Dirks v. SEC*, 463 U.S. 646, 654 (1983) (citing *Chiarella*, 445 U.S. at 227–235) (classical theory); *O'Hagan*, 521 U.S. at 655 (misappropriation theory).  An insider can avoid liability by disclosing the relevant information publicly so that she is not at a trading advantage over the corporation's shareholders.  *Dirks*, 463 U.S. at 654.  A misappropriator can avoid liability by disclosing the fact that she will be trading on confidential information to her source; by doing so, the misappropriator is no longer deceiving her source, and thus she is not violating § 10(b).  *O'Hagan*, 521 U.S. at 655.

The classical and misappropriation theories extend liability to tippers who share inside information with another person for trading purposes, and to tippees who trade on the information.  *Obus*, 693 F.3d at 285.  A tipper is liable for insider trading if she has a duty to keep material nonpublic information confidential, she tips someone who could use the information in connection with securities trading, and she personally benefits from giving the tip. *Id.* at 289.  By secretly exploiting material nonpublic information for personal gain, the tipper deceptively breaches her duty to shareholders (classical theory) or her source (misappropriation theory), violating § 10(b).  *See id.* at 286.  The personal benefit to the tipper can be any type of benefit, including the satisfaction of making a gift to a relative or friend.  *Dirks*, 463 U.S. at 663– 64.

A tippee's liability is derivative of a tipper's liability; absent a breach of duty by the tipper, there can be no derivative breach by the tippee.  *Id.* at 662.  A tippee incurs liability for a tipper's breach if he knows or has reason to know that the tip was passed on in violation of a fiduciary duty, and he knows that the tip is material nonpublic information, but he nevertheless

trades on the information or tips the information for his own personal benefit.  *Obus*, 693 F.3d at

286–89.  The tippee is said to inherit the tipper's duty to abstain from trading or make the

appropriate disclosure.  *Id.* at 288.

     As this discussion has suggested, the requisite state of mind for all the foregoing theories

of liability is scienter.  *Id.* at 286 (citing *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 167–68

(2d Cir. 1980)).  Scienter is "a mental state embracing intent to deceive, manipulate, or

defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976).  Negligence does not

rise to the level of scienter, *id.*, but recklessness is sufficient in this circuit and ten others, *Obus*,

693 F.3d at 286 (citing *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998)).  In this

context, reckless disregard for the truth is "highly unreasonable" conduct that is an "extreme

departure from the standards of ordinary care."  *Id.* (quoting *SEC v. McNulty*, 137 F.3d 732, 741

(2d Cir. 1998)).  "In every insider trading case, at the moment of tipping or trading, just as in

securities fraud cases across the board, the unlawful actor must know or be reckless in not

knowing that [his] conduct [is] deceptive."  *Id.*  Therefore, a tipper incurs liability for insider

trading only if she (1) knowingly or recklessly tips (2) information that she knows, or is reckless

in not knowing, to be material and nonpublic (3) in knowing or reckless violation of a duty to

keep the information confidential (4) for personal gain.  *Id.* at 286–89.  A tippee incurs liability if

all of those conditions obtain, plus (1) the tippee knows or is reckless in not knowing that the tip

is material nonpublic information, (2) the tippee knows or should know[4] that the tip was in

---

[4] In *Dirks*, the Supreme Court held that a tippee incurs liability if he "knows or should know"
that the tipper breached a fiduciary duty.  463 U.S. at 660.  This standard is very similar to
negligence, but negligence is generally an insufficiently culpable state of mind for securities
fraud.  *See Ernst & Ernst*, 425 U.S. 185.  The Second Circuit has resolved this tension by
limiting the "knows or should know" standard to apply only to the tippee's knowledge that the
tipper breached a fiduciary duty.  *Obus*, 693 F.3d at 288.  For all other elements of tippee
liability, scienter applies.  *Id.*

breach of a fiduciary duty, and (3) the tippee intentionally or recklessly uses the information by

trading or tipping for personal benefit.  *Id.*

### 3.    Application

The allegations in the amended complaint are sufficient to state a plausible claim that

Jafar and Nabulsi are liable for insider trading.  As with the original complaint, the SEC's well-

pleaded factual allegations establish that there was material nonpublic information about Onyx to

be tipped; that Defendants (now known to be Jafar and Nabulsi) placed substantial and well-

timed bets that, by late July, Onyx's stock would rise above values ranging from $80 to $92.50 a

share; and that the details of Amgen's offer were published in the Financial Post before Onyx

formally announced the offer.  Likewise, the amended complaint now alleges the same facts

about the Life buyout: that there was material nonpublic information about Life to be tipped; that

Jafar and Nabulsi placed substantial and well-timed bets that, within slightly over 24 hours,

Life's stock would rise above roughly $55 a share; and that the details of Life's solicitation for a

buyout were published in the Financial Post before Life intended to make the information public.

The amended complaint goes further and makes direct allegations where the initial

complaint did not.  Based on the SEC's allegations, it is fair to characterize both the Life and

Onyx trades as risky and suspicious.  Neither Jafar nor Nabulsi had purchased Life or Onyx

securities before he suddenly made large purchases in January and June 2013, respectively.  The

trades were remarkably well-timed and highly profitable: both came just before Critchley

published information causing Life and Onyx stock to jump in value.  And as described above,

the SEC has now alleged information sufficient to show that, at least on the days Jafar and

Nabulsi made these trades, most of their call option purchases constituted a substantial portion of

12

the trading volume in the series that day.[5] The January 55 call options were particularly

suspicious. Jafar and Nabulsi essentially bet $32,475 that Life's stock price would increase more

than 3.7% in one day.

There are other circumstances supporting the inference that Jafar and Nabulsi acted on a

tip. Given the strict confidentiality agreements in place, it is plausible to infer that any

information leaked about the Life and Onyx negotiations was leaked in violation of a fiduciary

duty. If Critchley reported information from documents that were marked as confidential,

including the confidentiality agreements themselves, Critchley knew that the information was

nonpublic and leaked in violation of a fiduciary duty. These circumstances are also a strong

basis for the inference that Jafar and Nabulsi knew or should have known about the violation.

Jafar and Nabulsi were experienced traders who invested substantial amounts of money. They

held their positions for just days; in the case of Life, for less than a day. The nature of this

information—a potential buyout that had not yet been reported in the news—strongly supports a

plausible inference that Jafar and Nabulsi knew the information to be nonpublic and leaked in

violation of a fiduciary duty.

Altogether, although the SEC has not alleged the identity of the tipper or the specific

content of the tip, the overall circumstances of these two sets of trades, in conjunction with one

another, make it plausible that Jafar and Nabulsi acted on an actual tip about Life and Onyx

consisting of material nonpublic information. If the fortuitious timing were not enough, both

Jafar and Nabulsi immediately liquidated their positions in both Life and Onyx following the

Critchley articles. The SEC has also identified a limited class of potential tippers: Critchley, or

someone closely connected to him. Jafar and Nabulsi's trading followed closely on the heels of

---

[5] The amended complaint does not indicate the volume of Life's February 55 call options that
traded on January 17, 2013, nor any information about the daily volume of any CFDs.

board meetings at both Life and Onyx regarding offers to purchase each company.  Critchley

reported on the content of those meetings shortly after they took place, but not before Jafar and

Nabulsi could beat the market.  The two well-timed sets of trades, in conjunction with

Critchley's well-timed articles (Critchley only reported his information after the market closed

for the day), are a sufficient basis for the inference that Critchley, or someone close to him, was

feeding information to Jafar and Nabulsi.

> **B.      Asset Freeze Order**

As noted in the opinion on the first motion to dismiss in this case, district courts enjoy

general equity powers under Section 27 of the Securities Exchange Act of 1934.  *Smith v. SEC*,

653 F.3d 121, 127 (2d Cir. 2011) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103

(2d Cir. 1972)).  Once these powers are invoked by a showing of a securities law violation, the

court has the power to order all equitable relief necessary, including an asset freeze.  *Id.*

(citations omitted).  An asset freeze is intended to preserve funds that a defendant may be

ordered to pay if he is held liable.  *Id.* (citing *Unifund*, 910 F.2d at 1041).

Section 21(d) of the Securities Exchange Act requires courts to grant the SEC's

application for injunctive relief "upon a proper showing."  15 U.S.C. § 78u(d)(1).  The standard

for an asset freeze is not as high as the usual standard for a preliminary injunction; rather, the

SEC is required to show either a likelihood of success on the merits or that "an inference can be

drawn" that the defendant violated federal securities law.  *Smith*, 653 F.3d at 128 (citing *SEC v.

Byers*, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *3 (S.D.N.Y. Aug. 8, 2011)).  The decision to

freeze assets, or to modify an asset freeze, is committed to the district court's discretion.  *Id.* at

127 (citing *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 438 (2d Cir. 1987)).  A district court

exercising that discretion should consider the type of relief sought by the SEC when evaluating

the likelihood of success on the merits.  *Id.* at 128 (*citing Unifund*, 910 F.2d at 1039).  Asset

freeze orders are less burdensome on defendants than other types of injunctive relief; for that

reason, the required showing of success on the merits (or a permissible inference) is lower,

especially if the freeze order is limited in duration.  *See Unifund*, 910 F.2d at 1039, 1041 (citing

*SEC v. Levine*, 881 F.2d 1165, 1177 (2d Cir. 1989)) ("[A]n ancillary remedy may be granted,

even in circumstances where the elements required to support a traditional SEC injunction have

not been established, . . . and such a remedy is especially warranted where it is sought for a

limited duration.").  The district court may assess any relevant circumstance to determine the

coverage, terms, and duration of an asset freeze, if one is appropriate.  *SEC v. Unifund SAL*, 917

F.2d 98, 99 (2d Cir. 1990), *denying pet. for reh'g of* 910 F.2d 1028.

The SEC has filed evidence even more substantial than the evidence filed in support of

the asset freeze order in opposition to the Defendants' first motion to vacate.  Counsel for the

SEC, Melissa Buckhalter-Honore, contacted Thermo Fischer and Onyx to confirm that Life,

Thermo Fischer, Onyx, and Amgen were caught off guard by Critchley's articles discussing their

confidential negotiations.  (Buckhalter-Honore Decl. ¶¶ 3–4, Dkt. No. 63.)  She also confirmed

with the *Financial Times* that Critchley's article about Life was published after the market closed

on January 17, 2013.  (*Id.* ¶ 2.)  A specialist employed by the SEC, Matthew Koop, used the

Market Information Data Analytics System to access data disseminated by the Options Price

Reporting Authority about the trades in question.  (Koop Decl. ¶¶ 2–3, Dkt. No. 64.)  The data

mirror the SEC's allegations regarding the price and volume of call options Jafar and Nabulsi

purchased, the total daily volume for the series in which Jafar and Nabulsi traded, and the times

of Jafar and Nabulsi's trades, and whether Jafar and Nabulsi were the first traders to purchase

call options in a particular series on a particular day.  (*Id.* ¶¶ 4–14.)  As was true before, Jafar

and Nabulsi's innocent explanation for their trading does not affect the Court's conclusion that

there is "a basis to infer" that they are liable for insider trading.

**III.     Conclusion**

For the foregoing reasons, Defendants' motion to dismiss the complaint is DENIED.

The order freezing a total of $2,551,226 of assets transferred to (1) account number 623-

90360 under the name Dhia Yahya Dhia AI-Din Jaffar, and (2) account number 623-90361 under

the name Omar Abbas Wajih Nabulsi is hereby extended pending final disposition of this case.

The Clerk of Court is directed to terminate the motion at Docket No. 51.

SO ORDERED.

Dated:  New York, New York
        September 29, 2014

_____
              J. PAUL OETKEN
        United States District Judge